# DOMINGUEZ DE GUYER *v.* BANNING.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 24.   Argued January 8, 1897. — Decided May 24, 1897.

The Board of Commissioners appointed under the act of Congress of March 3, 1851, 9 Stat. 631, c. 41, confirmed to Manuel Dominguez and others, claimants under a Mexican grant, a certain tract of land known as the Rancho San Pedro. Upon appeal to the District Court of the United States for the Southern District of California, the action of the Board was approved, and it was adjudged, February 10, 1857, that the claimants had a valid title to that ranche; the decree giving the boundaries to the lands so confirmed. In execution of the decree, the lands were surveyed under the direction of the United States surveyor general of California. The survey upon its face excepted, reserved and excluded from the claim surveyed the inner bay of San Pedro. Within the exterior lines of that bay is Mormon Island, containing at mean low tide 18.88 acres, and at mean high tide, about one acre. The survey having been filed in the Land Department, a patent was issued February 19, 1858, to the claimants under the decree of confirmation, conveying lands that were outside the exterior lines of the inner bay of San Pedro, and containing eight square leagues more or less. The patent followed the survey, and did not include that bay or any lands within its exterior lines. The present action was brought by various parties, asserting title under the decree of confirmation, to recover possession of the above 18.88 acres. The defendant claimed under a patent issued to him by the United States in 1881. No application was ever made to the District Court of the United States to correct any error in the decree of 1857, nor was any step taken to have a new survey or to obtain a patent conveying all the lands apparently embraced by that decree : *Held,*

(1) If the surveyor general misinterpreted the decree of confirmation, and made a survey which excluded from the surveyed claim any of the lands within the lines given by that decree, it was within the power of the District Court to have its decree properly executed, and to that end to order a new survey ;

(2) While it may be true, in some cases, that an action to recover possession of lands confirmed to a claimant under the act of 1851 can be maintained before a patent is issued, a patent issued avowedly in execution of a decree passed under that act, was conclusive between the United States and the claimants, and until cancelled, such patent alone determines, in an action to recover possession, the location of the lands that were confirmed by the decree ;

(3) The patent in question having been accepted by the patentees, and

being uncancelled, the plaintiffs in this action, claiming under the patentees, cannot recover lands not embraced by it, even if such lands are embraced by the lines established by the decree of confirmation — the conclusive presumption being that the patent, being uncancelled, correctly locates the lands covered by the confirmed grant.

The court further said it was unnecessary to decide whether the defendant was entitled to a judgment on his cross-complaint, or whether the lands under the navigable waters of the inner bay of San Pedro, and those here in controversy or any part thereof, passed to the State of California upon its admission into the Union, or after the issuing of the patent of 1858.

THE case is stated in the opinion.

*Mr. Jefferson Chandler* for plaintiffs in error.

*Mr. Stephen M. White* for defendant in error.

*Mr. Solicitor General* filed a brief for the United States.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action is in form ejectment. It was brought May 17, 1886, in the Superior Court of the county of Los Angeles, California, by Ana J. Dominguez De Guyer and others to recover the possession of a certain island known as Mormon Island in the inner bay of San Pedro, California. At mean high tide the island has an area of less than one acre; at mean low tide, about 18.88 acres. The area of the bay, including the island, is 1100.59 acres.

The defendant Banning filed an answer, in which he denied the allegations of the complaint; also, a cross-complaint asserting title in himself, and asking a judgment declaring him to be the owner and of right in possession of the premises in controversy.

A jury having been waived, and the cause having been tried by the court, judgment was rendered that the plaintiffs take nothing by their action, and that the defendant was the owner, seized in fee and entitled to the possession of the lands described in the pleadings. That judgment was reversed by the Supreme Court of California. Three of the members of that court as then constituted — Justices Fox, Sharpstein and

Paterson — were of opinion that the island, as well as the whole of the inner bay within the exterior lines of a grant alleged to have been made by the Mexican government to Christobal Dominguez, belonged to the claimants under that grant, and that the title was vested in the plaintiffs. Mr. Justice Thornton was of opinion that the plaintiffs were entitled to recover the island and such other portion of the land sued for as contained 18.88 acres, and was not covered by the navigable waters of the inner bay. Chief Justice Beatty and Justice McFarland dissented.

Upon a rehearing the court, then constituted of Chief Justice Beatty and Justices De Haven, McFarland, Harrison, Garoutte and Sharpstein, unanimously affirmed the judgment of the inferior court. 91 California, 400.

The present appeal was prosecuted by the Los Angeles Terminal Land Company and George Carson, trustee, they having, after the final decision in the state court, become vested with all the right, title and interest of the original plaintiffs.

The case has been twice orally argued in this court, and we have, in addition, the benefit of a brief filed by leave of court, on behalf of the United States in support of the judgment below, the Solicitor General having stated that the Government has a deep interest in the result of the litigation by reason of the fact that it has heretofore expended vast sums of money in improving the navigation of the inner bay of San Pedro, and the entrance thereto; and that this bay is regarded as one of the most important points on the Pacific Coast as a harbor of refuge.

The history of the title to the lands in controversy, as shown by acts of Congress, public documents and records is substantially as follows:

By the act of Congress of March 3, 1851, 9 Stat. 631, c. 41, provision was made for the appointment of a Board of Commissioners to ascertain and settle private land claims in California.

That act declared that every person claiming lands in that State by virtue of any right or title derived from the Spanish

or Mexican government should present the same to that Board,
together with such documentary evidence and testimony of
witnesses as the claimant relied upon in support of his claim
— the decision when rendered to be certified, with the rea-
sons on which it was founded, to the District Attorney of the
United States for the District in which it was rendered. § 8.
In case of the rejection or confirmation of a claim, provision
was made for a review of the decision by the District Court
of the District in which the land was situated; and an appeal
was allowed from the judgment of that court to the Supreme
Court of the United States. §§ 9, 10. When deciding on the
validity of any claim the Board, as well as the courts, were
to be governed by the treaty of Guadalupe Hidalgo, the law
of nations, the laws, usages and customs of the government
from which the claim was derived, the principles of equity
and the decisions of the Supreme Court of the United States
as far as they were applicable. § 11.

By the thirteenth section of the act it was provided "that
all lands, the claims to which have been finally rejected by
the Commissioners in manner herein provided, or which shall
be finally decided to be invalid by the District or Supreme
Court, and all lands the claims to which shall not have been
presented to the said Commissioners within two years after
the date of this act, shall be deemed, held, and considered as
part of the public domain of the United States; and for all
claims finally confirmed by the said Commissioners, or by the
said District or Supreme Court, a patent shall issue to the
claimant upon his presenting to the General Land Office an
authentic certificate of such confirmation, and a plat or sur-
vey of the said land, duly certified and approved by the sur-
veyor general of California, whose duty it shall be to cause
all private claims which shall be finally confirmed to be accu-
rately surveyed, and to furnish plats of the same; and in the
location of the said claims, the said surveyor general shall have
the same power and authority as are conferred on the register
of the land office and receiver of the public moneys of Louisi-
ana, by the sixth section of the act 'to create the office of
surveyor of the public lands for the State of Louisiana,'

approved third March, one thousand eight hundred and thirty-one. . . ."

It was further provided "that the final decrees rendered by the said Commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons." § 15.

On the 19th day of October, 1852, Manuel Dominguez, Conception Roche and others presented to the Board of Commissioners appointed under the above act a petition, claiming a certain tract of land in the county of Los Angeles, known by the name of San Pedro, containing ten square leagues, more or less. The petition stated that some of the plaintiffs claimed by inheritance and a portion by purchase from the heirs of Christobal Dominguez, who, it was alleged, died seized in fee thereof, having inherited from his uncle, Juan José Dominguez, who also died seized thereof in fee about the year 1809 or 1810; that the latter previous to his death obtained "a perfect grant or concession of the said tract, but at what particular date or from what precise governor cannot now be discovered, owing to the fact that during his lifetime the papers issued and granted, it is believed by José Dario Arguello, governor of the peninsula, in pursuance of the power duly vested in him, were burnt or lost; which said papers, it is averred, contained a complete or perfect grant to the said Juan José"; that such title had been frequently and repeatedly acknowledged by both the Spanish and Mexican governments, and particularly by Don Pablo Vincente de Sola, governor of the province of California, by decree bearing date December 31, 1822; that the said Christobal Dominguez, the father and grandfather of the majority of the petitioners, possessed the tract peaceably and quietly up to his death, and died in the full and legal seizure thereof about 1823; that since that time his heirs and representatives have held and still hold the full, recognized and peaceable possession thereof, except as thereafter stated in the petition, which possession was known to the Mexican government and

approved, ratified and confirmed by it in numberless instances; that the lines and boundaries of the tract were and had always been well known, defined and respected; and that about the year 1817 the judicial possession thereof was given by competent authority, and its lines and boundaries marked out and clearly defined.

The petitioners, after stating their relationship to Christobal Dominguez, averred that they claimed " in fee the said Rancho of San Pedro as tenants in common in the shares and proportions as aforesaid in virtue of the aforesaid grants, of their long pacific possession, and of the ratification, approval and acknowledgment of their title by the Mexican government."

The prayer of the claimants was that their title to the Rancho San Pedro be confirmed.

The Board of Commissioners sustained the claim of the petitioners, and an appeal was prosecuted by the Government to the District Court of the United States for the Southern District of California. In that court, on the 10th day of February, 1857, the following judgment was rendered:

" It is ordered, adjudged and decreed that the decision of the said Board of Land Commissioners be, and the same hereby is, affirmed. And it is further adjudged and decreed that the claim of the appellees to the lands claimed in this case is good and valid and the same are hereby confirmed to them as follows: The lands of which confirmation is hereby made are those known as the ' Rancho of San Pedro,' situate in Los Angeles County, and bounded as follows:

" Commencing at the large sycamore tree (aliso) standing on the side of the high road leading from San Pedro to Los Angeles, thence running in a westerly direction to a stone placed near the high road above mentioned and near a small arroyo or creek; thence crossing the plain and following the line of said stones, which are placed as landmarks along said boundary line, to a large stone placed as a monument in said line on the top of a sand hill; thence to the sea, passing by and including the salt ponds known by the name of Las Salinas; thence along the sea until it reaches a point opposite the northern line of the Rancho Palos Verdes, occu-

pied by and confirmed by said commissioner to the Sepulvedas; thence following said line in an easterly direction to some sand hills for about twelve thousand varas; thence southerly to a point called La Goleta on the sea coast; thence following the sea coast easterly to the river San Gabriel; thence up said river to a point where a line drawn from the stone first mentioned through said sycamore tree would strike said river; thence along such line to the place of beginning, containing eight and a half (8½) square leagues, a little more or less."

The United States asked and was allowed an appeal from this decision. But the Attorney General of the United States having given notice that the Government would not prosecute the appeal, the parties stipulated in writing that the order granting the appeal be vacated, and that the claimants might proceed under the decree as under a final decree. That stipulation was filed in the cause on the 4th day of June, 1857, and on the same day an order was made, vacating the allowance of the appeal, and giving the claimants leave to proceed as under a final decree.

On the 18th day of December, 1858, a patent was issued by the United States to the persons in whose behalf the decree of confirmation was made. The patent did not set out the decree, nor give the boundaries of the confirmed tract as described in it, but after referring to the petition presented to the Board of Land Commissioners and stating generally that the petitioners claimed therein the comfirmation of the tract known by the name of San Pedro, proceeded:

"And whereas the Board of Land Commissioners aforesaid, on the 17th day of October, 1854, rendered a decision that 'the claim of the said petitioners is valid, and it is therefore decreed that the same be confirmed to them, to hold and possess the same as tenants in common in the respective shares and proportion which they hold in and to the premises thereby confirmed by title deduced from Christobal Dominguez, deceased, by heirship or mesne conveyances, it being the intention to confirm to each of said petitioners the respective title held by him at the time of his becoming a party to this proceeding, derived from the source above mentioned'; which

decree or decision was confirmed by the District Court of the United States for the Southern District of California on the tenth day of February, 1857; and whereas it further appears from a certified transcript on file in the General Land Office that the Attorney General of the United States having given notice that the appeal to the Supreme Court of the United States in this cause would not be prosecuted, the aforesaid District Court, on the fourth day of June, 1857, 'ordered that the order of this court made on the twenty-fourth day of February, A.D. 1857, granting an appeal to the Supreme Court from the decree of confirmation of this court, filed on the tenth day of February, 1857, be, and is hereby, vacated, and that the said claimants have leave to proceed under said decree as under a final decree.'

"And whereas, under the thirteenth section of the act of Congress of the third of March, 1851, there have been presented to the Commissioner of the General Land Office a plat and certificate of the survey of the land confirmed as aforesaid, authenticated on the 19th day of February, 1858, by the signature of the surveyor general of public lands in California; which plat and certificate are in the words and figures following, to wit:

"'U. S. SURVEYOR GENERAL'S OFFICE,

"'*San Francisco, California.*

"'Under and by virtue of the provisions of the thirteenth section of the act of Congress of the third of March, 1851, entitled "An act to ascertain and settle the private land claims in the State of California," and of the twelfth section of the act of Congress approved on the 31st of August, 1852, entitled "An act making appropriations for the civil and diplomatic expenses of the Government for the year ending the thirtieth of June, eighteen hundred and fifty-three, and for other purposes," and in consequence of a certificate of the United States District Court for the Southern District of California, of which a copy is annexed, having been filed in this office, whereby it appears that the Attorney General of the United States having given notice that it was not the intention of the United States to prosecute the appeal from the

decision of the said District Court by which it affirmed the decision of the Board of Commissioners appointed under the provisions of the said act of the third of March, eighteen hundred and fifty-one, to ascertain and settle the private land claims in the State of California, by which they recognized and confirmed the title and claims of Manuel Dominguez *et al.* to the tract of land designated as the Rancho "San Pedro," containing eight and a half square leagues, a little more or less, the said appeal has been vacated by the said District Court, and thereby the said decisions in favor of the said Manuel Dominguez *et al.* have become final, I have caused the said tract to be surveyed in conformity to the boundaries specified in the said confirmatory decree, and do hereby certify the annexed map to be a true and accurate plat of the said tract of land as appears by the field-notes of the survey thereof made by Henry Hancock, deputy surveyor, in the month of December, 1857, under the directions of this office, which, having been examined and approved, are now on file therein.

" ' And I do further certify that, under and by virtue of the said confirmation and survey, the said Manuel Dominguez *et al.* are entitled to a patent from the United States upon the presentation hereof to the General Land Office for the said tract of land, the same being described as follows, to wit:

[Here follows a description, by metes and bounds, of the exterior lines of the Rancho San Pedro, within which is Mormon Island in the inner bay of San Pedro.]

" ' Excepting, reserving and excluding from the tracts as thus surveyed that portion thereof covered by the navigable waters of the inner bay of San Pedro, and which are included within the following-described lines, to wit: Beginning at the stake on the high-water line of the inner bay of San Pedro on the line between stations twenty-three and twenty-four of the survey of the rancho, and which stake is two hundred and twelve chains south seven degrees thirty-two minutes east from said station number twenty-three.

[Here in the body of the certificate is a table showing the metes and bounds of the entire survey, and also a table headed

"Traverse of inner bay of San Pedro to be excluded from survey of the claim," and showing the metes and bounds of the part so excluded; and immediately below the last table are these words: "Area within the exterior lines of the confirmed tract, 44,219.72 acres; area within lines '7' to '16,' being the lands covered by the navigable waters of the inner bay of San Pedro, connected with the ocean, and therefore to be excluded, 1100.50 acres; area included in the boundaries specified by the confirmatory decree, exclusive of bay, 43,119.13 acres."]

"'Thence according to the true meridian (the variation of the magnetic needle being thirteen degrees thirty minutes east) along the high-water line of the inner bay of San Pedro south eighty degrees forty-five minutes east ten chains and eighty-four links to station. . . . Thence north thirty-one degrees thirty minutes west, crossing the channel or entrance to the bay, nineteen chains and forty-four links to " La Goleta," exterior boundary station number twenty-four, and thence north seven degrees thirty-two minutes west, crossing the said "inner bay," one hundred and twenty-five chains and twenty links to the stake on the high-water line of the bay and commencement of this survey thereof.

"'Containing exclusive of the lands above described as covered by the navigable waters of the inner bay of San Pedro, forty-three thousand one hundred and nineteen acres and thirteen hundredths of an acre, and being designated upon the plats of the public survey as lots numbered thirty-seven, thirty-eight and thirty-nine, in township three south, of range twelve west; lot number thirty-seven, in township three south, of range thirteen west; lot number thirty-seven, in township three south, of range fourteen west; lot number thirty-seven, in township four south, of range thirteen west; lot number thirty-seven, in township four south, of range fourteen west; lot number thirty-seven, in township four south, of range fifteen west, and lot number thirty-seven, of township five south, of range thirteen west of the San Bernardino meridian line.

"'In testimony whereof I have hereunto signed my name

and affixed the seal of said office this nineteenth day of February, A.D. 1858.

" ' [L. S.]                          J. W. MANDEVILLE,
                                     " ' *U. S. Sur. Gen'l, Cal.*' "

"Now know ye that the United States of America, in consideration of the premises and pursuant to the provisions of the act of Congress aforesaid of 3d March, 1851, have given and granted, and by these presents do give and grant, unto the said Manuel Dominguez, Conception Roche, Bernardino Roche, José Antonio Aguirre, Maria Jesus Cotta de Dominguez, Madalena Dominguez, Andres Dominguez, Feliciana Dominguez, Estaban Dominguez, Maria Dominguez, Pedro Dominguez, José Dominguez, Maria, widow of Manuel Roche, and Antonio Jacinto Roche, and to their heirs, the tract of land embraced and described in the foregoing survey in the respective shares and proportions which they hold in the premises ' by them deduced from Christobal Dominguez, deceased, by heirship or by mesne conveyances, but with the stipulation that in virtue of the fifteenth section of the said act the confirmation of the said claim and this patent shall not affect the interest of third persons,' to have and to hold," etc.

This patent appears to have been recorded December 28, 1869, at the request of Manuel Dominguez.

At the trial the plaintiffs read in evidence the petition of claimants before the Board of Land Commissioners for the confirmation of the Rancho San Pedro; the decree of the Board confirming the same; the decree of the District Court confirming the decision of the Commissioners, and the orders therein made as above stated; and a copy of the above patent from the United States.

At this stage of the trial it was stipulated between counsel that "whatever title vested by said confirmation and patent in said petitioners and confirmees had passed to and become vested in the plaintiffs in this action, who are now owners of whatever title passed under said confirmation and patent to the said petitioners and confirmees."

A witness for the plaintiff, who was a surveyor, testified that "the lines of the decree of confirmation and the exterior lines of the patent and the patent map were identical; that the survey was made in conformity to the decree of confirmation, and from that survey the description contained in the patent was made"; and that the inner bay of San Pedro, within which was Mormon Island, was within the exterior lines called for in that decree and defined on the patent map.

Banning, in support of his claim to the premises, introduced in evidence a patent from the United States, of date December 30, 1881, for lot one of section eight, in township five south, of range thirteen west, of San Bernardino meridian in California, "containing 18.88 acres, according to the official plat of the survey of the said lands returned to the General Land Office by the surveyor general"; and a quitclaim deed to him from A. A. Polhamus, navigator, for "a certain tract of land situate in the bay of Wilmington, county of Los Angeles, State of California, known as Mormon Island, and all the land adjoining thereto, to which I [the grantor] have any title or claim."

Banning testified in his own behalf that he entered into possession of Mormon Island in 1880, his possession beginning by his buying out the person then on the island. But he does not state who that person was or by what right he was in possession. He also testified that when he took possession he claimed that the title was in the United States, and he continued to so claim until he obtained a patent from the United States, when he claimed the property for himself; and that he has been in possession since 1890, no one else claiming the right of possession until the present plaintiffs set up their claim by this suit. He said : "This tract of land known as Mormon Island is an island; at about half tide it is an island, and is now an island at low water; at low water it is only partly surrounded by water; at low water it would not be surrounded with water; at mean tide there would be about two feet of water around it; at high tide it is almost all covered with water. . . . A very small portion of the island is above ordinary high water. At mean tide, I don't think there is an acre above water. The

descriptive clause in the patent to me extends to mean low water. I think to include eighteen acres would carry it to mean low water. We occupied a portion of it that was covered with water. I have shipways there and houses on piles. About an acre is covered in that way. Another portion of the island we run lighters on and pile lumber on when the high tide falls. We use in that way sometimes a couple of acres on the west side, the channel side of the island, and that kind of occupation would cover about three acres."

There was some evidence as to how certain lands, including Mormon Island, were assessed from 1880 to 1887 inclusive. But in the view the court takes of the case it is not necessary to advert to it.

The map which accompanied and was made part of the patent of 1858 shows the exterior lines of the survey made under the decree of confirmation. Those lines include the whole of the inner bay of San Pedro. The map also shows the exterior lines of the bay itself. But across that part of the map which designates the bay are the words "inner bay of San Pedro (Exception)." And, as already stated, the map has on its face not only a table showing the exterior lines of the entire boundary run by the surveyor general, but a table of courses and distances, under the heading "Traverse of inner bay of San Pedro to be excluded from survey of the claim." It is not disputed that Mormon Island is within the exterior lines of this inner bay, and is almost covered with water at high tide. That the part excluded or excepted from the survey embraced the navigable waters of the inner bay cannot be doubted. Was it not also intended to exclude Mormon Island, which, according to the opinion of the court below on the original hearing, consisted, at high water, "of a pile of rocks, covering not much more than an acre?" This question was answered in the negative by the Supreme Court of California, which, on the rehearing of the case, said: "The remaining question is, whether the land in controversy is included within the exception; and, as to this, we entertain no doubt that the exception properly construed embraces all the lands within the exterior boundaries of the inner bay of

San Pedro, as shown on the map accompanying the patent and is not confined simply to such land as is covered by the navigable waters of that Bay. That this is the true meaning of the exception is made to appear not only from the fact that the inner bay of San Pedro is marked 'excepted' upon the map referred to, but is also conclusively shown by the concluding portion of the survey itself, as returned and certified, in which, after giving the boundaries of the land surveyed by courses and distances, it designates the land surveyed, ' exclusive of the lands above described as covered by the navigable waters of the inner bay of San Pedro,' as being certain numbered lots on the plats of the public survey, neither of which lots includes any portion of the land within the exterior boundaries of the inner bay of San Pedro, as marked on said map." We entirely concur in that view. The purpose of the surveyor general was to set apart to the claimants under the decree of confirmation, 43,119.13 acres, and not to include in, but distinctly to exclude from, the surveyed claim the 1100.50 acres within the exterior lines of the inner bay. And that there might be no doubt where and how the confirmed tract was located, the survey describes the 43,119.13 acres as being designated upon the plats of the public survey as certain numbered "lots." Mormon Island is not within any of those lots. The Island, therefore, was not included within, but was excluded from, the surveyed claim, nor patented to the claimants who obtained the decree of confirmation.

The plaintiffs, therefore, contend that we have a case in which the survey made in execution of the decree of confirmation under the act of 1851, and the patent based on that survey, except and exclude lands which, although within the exterior lines of the bay, are within the exterior lines of the confirmed tract as described in such decree.

But does it follow that in this action to recover possession the plaintiffs can recover lands that were excluded from the survey, and are not embraced by the patent based upon that survey? The plaintiffs offered in evidence in support of their title a patent which manifestly did not grant lands that were excluded from the surveyed claim; and yet it is contended

that they may go behind both the survey and patent, and recover the possession of the lands so excluded, precisely as they could do if the lands had been included in both the survey and patent.

In our opinion, if those who obtained the decree of confirmation objected to the survey as not being in conformity with that decree, their objection should have been made known to the District Court before the survey was transmitted to the General Land Office, or at least before it was acted upon and made the basis of a patent. The patent was not issued until nearly a year after the survey was made and certified. Under the act of 1851, it was within the power of the District Court to have required a survey in exact conformity with its decree. Its jurisdiction over the subject did not end with the decree. The surveyor general was required by the statute (§ 13) to cause an accurate survey to be made of all private claims finally confirmed under the act of 1851, and to furnish plats of the same. If he misinterpreted the decree; if he made an inaccurate survey, and excluded from it lands that were confirmed to the original claimants, the court had authority to compel the proper execution of its decree.

In *United States* v. *Fossatt*, 21 How. 445, 450, decided in 1858, which case arose under the act of 1851 for the settlement of private land claims in California, this court, speaking by Mr. Justice Campbell, said : "It is asserted on the part of the appellants that the District Court has no means to ascertain the specific boundaries of a confirmed claim, and no power to enforce the execution of its decree, and consequently cannot proceed further in the cause than it has done. The thirteenth section of the act of the 3d of March, 1851, makes it the duty of the surveyor general to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same. It was the practice under the acts of 1824 and 1828, 4 Stat. 52, 284, for the court to direct their mandates specifically to the surveyor designated in those acts. And in the case *Ex parte Sibbald* v. *United States*, 12 Pet. 488, the duty of the surveyor to fulfil the

decree of the court, and the power of the court to enforce the discharge of that duty, are declared and maintained. The duties of the surveyor begin under the same conditions, and are declared in similar language, in the acts of 1824, 1828 and of 1851. The opinion of the court is, that the power of the District Court over the cause, under the acts of Congress, does not terminate until the issue of a patent, conformably to the decree." To the same effect was *United States* v. *Berreyesa's Heirs*, 23 How. 499.

The power of the District Court over proceedings taken in execution of its decree was distinctly recognized by, although existing before, the act of June 14, 1860, 12 Stat. 33, c. 128, which provided that "the District Courts of the United States for the Northern and Southern Districts of California are hereby authorized, upon the application of any party interested, to make an order requiring any survey of a private land claim within their respective districts to be returned into the District Court for examination and adjudication, and on the receipt of said order, duly certified by the clerk of either of said courts, it shall be the duty of the surveyor general to transmit said survey and plat forthwith to said court."

Referring to the act of 1860, in *United States* v. *Halleck*, 1 Wall. 439, 454, (1863) — in which case a second survey had been ordered prior to the act of 1860, and was pending when that act was passed — Mr. Justice Field, speaking for the court, said that whatever question might be raised as to the jurisdiction of the District Court to supervise the survey previous to that act, there could be none after its passage. And in *Fossat's case*, 2 Wall. 649, 712 (the same one above reported in 21 How.), Mr. Justice Nelson, delivering the opinion of the court, said : "The fundamental error in the argument is in assuming that the survey and location of the land confirmed are not proceedings under the control of the court rendering the decree, and hence not a part of the judicial action of the court. These proceedings are simply in execution of the decree, which execution is as much the duty of the court, and as much within its competency, as the hearing of the cause and the rendition of its judgment; as much so as the execu-

tion of any other judgment or decree rendered by the court. This power has been exercised by the court ever since the Spanish and French land claims were placed under its jurisdiction, as may be seen by the cases referred to in the opinion of the court in this case when last before us, and in many others to be found in the reports. The powers of the surveyor general under these acts were as extensive and as well defined as under the act of 1851. The act of 1860 did not enlarge or in any way affect his powers. They remained the same as before."

So far from the claimants under the decree of confirmation rendered in 1857 bringing the survey before the District Court in order that any error therein might be corrected, they accepted it as filed. We say this because the statute requires a patent to issue to the claimant "upon *his* presenting to the General Land Office an authentic certificate of the confirmation, *and a plat or survey of said land, duly certified and approved by the surveyor general of California.*" If the claimants under the decree of confirmation did not themselves present the survey to the General Land Office, and ask a patent in accordance therewith, they accepted a patent based upon that survey, and plainly showing that it conformed to a survey that did not embrace, for the purposes of a patent, anything within the exterior lines of the inner bay of San Pedro. If the Secretary of the Interior upon inspecting the survey and the decree of confirmation had authority to order a new survey or to disregard the part of it excluding lands within the exterior lines of the inner bay, the record does not show that any effort was made in the Land Office to bring about such a result. On the other hand, if the Land Office had only a ministerial duty to issue a patent in exact accordance with the decree of confirmation, no steps were taken to compel the performance of that duty. We have therefore a case brought in 1886 in which the plaintiffs seek to recover the possession of lands alleged to have been confirmed in 1857 to those under whom they claim, but which lands in 1858, nearly thirty years before the commencement of this action, were expressly excluded as well from the survey to which no

objection was urged, as from the patent issued to and accepted by the claimants under that decree.

We are of opinion that while it may be true, in some cases, that an action to recover possession of lands confirmed to a claimant under the act of 1851 can be maintained before a patent is issued, yet a patent issued avowedly in execution of such decree was conclusive between the United States and the claimants, and, until cancelled, it alone determines, in an action to recover possession, the location of the lands that passed under the decree. Such is the effect of former decisions of this court.

An instructive case upon the subject is *Beard* v. *Federy*, 3 Wall. 478, 491, in which this court considered the character and effect of a patent issued upon a confirmation of a claim to land under the laws of Spain or Mexico. The court said: " In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quitclaim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners. *Landes* v. *Brant*, 10 How. 373. In the second place, the patent is a record of the action of the Government upon the title of the claimant as it existed upon the acquisition of the country. Such acquisition did not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law of nations to protection in them to the same extent as under the former Government. The treaty of cession also stipulated for such protection. The obligation, to which the United States thus succeeded, was, of course, political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the act of March 3, 1851, they have declared the manner and the terms on which they will discharge this obligation. They have there established a special tribunal, before which all claims to lands are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the Government; authorized appeals from the

decisions of the tribunal, first to the District and then to the Supreme Court; and designated officers to survey and measure off the land when the validity of the claim is finally determined. When informed, by the action of its tribunals and officers, that a claim asserted is valid and entitled to recognition, the Government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the Government upon the title of the claimant. By it the Government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former Government, and is correctly located now, so as to embrace the premises as they are surveyed and described. As against the Government this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the Government by title subsequent. It is in this effect of the patent as a record of the Government that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail to be, as it was intended it should be, an instrument of quiet and security to its possessor. The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rest would be open to contestation. The intruder, resting solely upon his possession, might insist that the original claim was invalid or was not properly located, and, therefore, he could not be disturbed by the patentee. No construction which will lead to such results can be given to the fifteenth section. The term 'third persons,' as there used, does not embrace all persons other than the United States and the claimants, but

only those who hold superior titles, such as will enable them to resist successfully any action of the Government in disposing of the property."

These principles were recognized in *More* v. *Steinbach,* 127 U. S. 70, 83, and again in *Knight* v. *United States Land Association,* 142 U. S. 161, 187. See also *Meader* v. *Norton,* 11 Wall. 442, 457; *Adam* v. *Norris,* 103 U. S. 591, 593; *Stoneroad* v. *Stoneroad,* 158 U. S. 240; *Russell* v. *Maxwell Land Grant Co.,* 158 U. S. 253.

The decisions of the Supreme Court of California have been to the same effect.

In *Teschemacher* v. *Thompson,* 18 California, 11, 25, 26, the court, after referring to the statute of 1851, said: "As the last act in the series of proceedings, a patent is to issue to the claimant. This instrument is not only the deed of the United States, but it is a solemn record by the Government of its action and judgment with respect to the title of the claimant existing at the date of the cession. By it the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located, or might have been located, by the former Government, and is correctly located by the new Government, so as to embrace the premises as they are surveyed and described. Whilst this declaration remains of record, the Government itself cannot question its verity, nor can parties claiming through the Government by title subsequent."

In *Chipley* v. *Farris,* 45 California, 527, 538, which involved the title to lands alleged to have been covered by a Mexican grant, and in respect of which there were proceedings under the act of Congress of March 3, 1851, it was contended on one side that the patent was conclusive upon all points in the case, and put an end to all questions of lines and boundaries. On the other side, it was insisted that the confirmation of the claim gave the claimant a perfect title, and that he could not be divested of title to any lands embraced in the decree of confirmation by a patent that excluded a portion of them. The

Supreme Court of California said: "A patent, issued under the act of 1851, is, as has often been held by this court, the final act in proceedings instituted for the confirmation of the claim of the patentee to land which had been granted by the former Government, and for the segregation of such lands from the public lands of the United States; and it is a record which binds both the Government and the claimant, and cannot be attacked by either party, except by direct proceedings instituted for that purpose. *Leese* v. *Clark*, 18 California, 535. While it stands, the claimant, or those deriving title through him, will not be permitted to aver that the claim comprised other or different lands from those mentioned in the patent. . . . It is contended by the plaintiffs that the survey, which is incorporated into the patent, does not accord with the decree of confirmation, and that they are entitled to rely upon the decree — which is also incorporated into the patent — for title to lands within the decree, but not within the survey. This position cannot be maintained consistently with the views already expressed as to the nature and effect of the patent. The patent purports to convey the lands described in the survey, and its scope cannot be extended, nor on the other hand can it be limited, by showing that the decree comprised a greater or less area than the survey. Nor can the claimant, after admitting — as he must — the conclusive effect of the patent, make out title to lands not conveyed by the patent, by the production of the proceedings which culminated in the patent. The patent, while it remains in force, conclusively determines what lands the claimant was entitled to under his claim and the decree of confirmation. The claimant can neither reform the patent nor show that it is in any respect incorrect, in an action of ejectment." See also *Moore* v. *Wilkinson*, 13 California, 478; *Cassidy* v. *Carr*, 48 California, 339; *Gallagher* v. *Riley*, 49 California, 473, 477; *Carey* v. *Brown*, 58 California, 180, 185; *People* v. *San Francisco*, 75 California, 388; *Wright* v. *Seymour*, 69 California, 122. And as said by Mr. Justice Field in *Moore* v. *Wilkinson*, 13 California, 488, "the fifteenth section of the act of Congress of 1851 provides that the final decree of confirmation and

patent shall be conclusive between the United States and the claimants only, and shall not affect the interests of third persons. If conclusive between the United States and the claimants, it must be equally so between persons holding under either of those parties."

In our opinion the adjudged cases and the evidence in the cause leave no room to doubt the soundness of the conclusions announced by the Supreme Court of the State, namely: 1. That the lands in controversy are not embraced by the patent issued to the petitioners under the proceedings before the Board of Land Commissioners appointed under the act of 1851; 2. The patent having been accepted by the patentees, and being uncancelled, the plaintiffs in this action, claiming under the patentees, cannot recover lands not embraced by it, even if such lands are embraced by the lines established by the decree of confirmation — the conclusive presumption being that the patent correctly locates the lands covered by the confirmed grant.

It is proper to say that the court decides nothing more in this case than that the plaintiffs are not entitled to recover possession of the specific lands here in controversy. In this view it is unnecessary to decide whether the defendant Banning was entitled to a judgment on his cross complaint, nor whether the lands under the navigable waters of the inner bay of San Pedro, and those here in controversy or any part thereof, passed to the State of California upon its admission into the Union, or after the issuing of the patent of 1858.

*Judgment affirmed.*