**Terry I. BLUE, Plaintiff,**

v.

**Douglas McKAY, Secretary of the Interior, Defendant.**

**Civ. A. No. 1691–52.**

United States District Court
District of Columbia.

June 24, 1955.

---

Welburn Mayock, Washington, D. C., for plaintiff.

Perry W. Morton, Asst. Atty. Gen., and Thomas L. McKevitt, Department of Justice, Washington, D. C., for defendant.

McGARRAGHY, District Judge.

This is a proceeding for a judgment declaring (1) that the United States is rightfully the owner of and has accepted ownership by treaty and grant from the Republic of Mexico of the minerals in certain lands in California ceded by the Treaty of Guadalupe Hidalgo, 9 Stat. 922, and later patented by the United States to parties who claimed title under a prior Mexican grant; (2) that the Mineral Leasing Act of February 25, 1920, 41 Stat. 437, 443, 30 U.S.C. §§ 181, 226, 30 U.S.C.A. §§ 181, 226, is applicable to the right to develop the minerals under the said confirmed Mexican grant; and (3) for a mandatory injunction or order directing the Secretary of Interior to reprocess plaintiff's application for an oil and gas lease filed pursuant to the Mineral Leasing Act and to grant the plaintiff's application for such lease.

The defendant, while contending that the plaintiff could not obtain a decree directing issuance of an oil and gas lease since this involves a discretionary func-

tion of the Secretary of Interior, raised no objection to the Court's review of the Secretary's legal conclusion that title to the minerals passed with the patent, nor does the defendant claim that the owners of the surface rights are necessary parties to this proceeding.

By the Treaty of Guadalupe Hidalgo of February 2, 1848, 9 Stat. 922, the Mexican war was brought to a close and, among other things, a large territory including all of the present State of California was ceded to the United States. Among other provisions, the Treaty provided for the protection of property in the ceded territories which was then held by many individuals under prior grants from Mexico and Spain.

The Protocol of Querétaro dated May 26, 1848, contained the following clarifying provision:

"The American Government by suppressing the Xth Article of the Treaty of Guadalupe did not in any way intend to annul the grants of land made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the article of the Treaty, preserve the legal value which they may possess; and the grantees may cause their legitimate titles to be acknowledged before the American tribunals.

"Conformably to the law of the United States, legitimate titles to every description of property personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th day of May 1846 and in Texas up to the 2nd day of March 1836."

In order to establish the validity and the boundaries of the private claims and to set apart the lands privately owned from those which would thereafter be owned by the United States, Congress passed the Act of March 3, 1851, 9 Stat. 631, entitled "An Act to ascertain and settle the private Land Claims in the State of California."

The Act established a Board of Commissioners to hear all land claims with provision for appeal to the District Court and to the Supreme Court of the United States.

Sec. 8 of the Act provided that claimants should present their claims to the Commissioners when sitting as a Board and thereafter the Commission should "proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim" and thereafter, within thirty days from the date of the decision, to certify the same, with the reasons on which it was founded, to the District Attorney of the United States in and for the District for which the decision was rendered.

Sections 9 and 10 provided for a court review in the District Court of the United States and an appeal to the United States Supreme Court.

Sec. 11 provided that the Commissioners and the District Court and Supreme Court in passing upon the validity of any claim "shall be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable."

Sec. 13 of the Act, after providing that all lands, the claims to which have been finally rejected by the Commissioners or which are finally decided to be invalid by the courts, and all lands the claims to which shall not have been presented to the Commissioners within two years from the date of the Act, shall be deemed held and considered as part of the public domain of the United States, further provided that "for all claims finally confirmed by the said commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the general land office an authentic certificate of such confirmation, and a plat or survey of the said land, duly certified and approved by the

surveyor-general of California, whose duty it shall be to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same * * *."

Sec. 15 of the Act provided that "any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

On October 19, 1852, various heirs of Christobel Dominguez presented a petition to the Board of Commissioners appointed under the above Act claiming "in fee simple a certain tract of land situate in the County of Los Angeles, known by the name of 'San Pedro' containing ten square leagues, more or less."

The claim went on to state that the claimants "claim said tract of land, a portion of them by inheritance from, and a portion by purchase from, the heirs of Christobel Dominguez who died seized in fee thereof and who inherited from his uncle, Juan Jose Dominguez, who died also seized therefor in fee somewhere about the year 1809–10."

After reciting the chain of title and their relationship to Christobel Dominguez, the petition stated "and your petitioners therefore aver they claim in fee the said Rancho of San Pedro as tenants in common in the shares and proportions as aforesaid in virtue of the aforesaid grants, of their long and specific possession and of the satisfaction, approval and acknowledgment of their title by the Mexican Government."

The petition prayed "the Honorable Board to take their said claim into consideration and to declare their title to the said Rancho San Pedro good and valid, and to confirm the same, and as in duty bound, etc."

Thereafter, the Board of Commissioners sustained the claim of the petitioners and, in an opinion reciting the evidence in support of the claim, the Board held that the case "falls within the rules and as such is entitled to a confirmation", and "a decree will be entered in general terms confirming the title of the petition-

ers to the premises to hold the same as tenants in common in the proportion in which they are respectively entitled under their rights derived from the sources above mentioned."

A decree of confirmation was entered on October 17, 1854.

From the decision of the Board of Commissioners, an appeal was prosecuted by the Government to the District Court of the United States for the Southern District of California, which Court on the 10th day of February, 1857, entered its judgment affirming the decision of the Board of Land Commissioners. The judgment adjudged and decreed "that the claim of the appellees to the land claimed in this case is good and valid and the same are hereby confirmed in them as follows: the lands of which confirmation is hereby made are known as the 'Rancho San Pedro' situate in Los Angeles County and bounded as follows: * * * (Description follows)."

An appeal was taken from the decision of the District Court to the Supreme Court of the United States but was subsequently withdrawn. Thereafter, the survey was approved by the U. S. Surveyor General and a patent was issued on December 18, 1858.

After reciting the various procedural steps taken under the Act of March 3, 1851, including quotation of the complete survey authenticated by the U. S. Surveyor General, California, the patent concluded with the following grant:

"Now Know Ye, That the United States of America, in consideration of the premises, and pursuant to the provisions of the Act of Congress aforesaid of 3rd March 1851, Have Given and Granted, and by these Presents do Give and Grant, unto the said Manuel Dominguez, Concepcion Rocha, Bernrdino Rocha, Jose Antonio Aguina, Maria Jesus Cota de Dominguez, Madalina Dominguez, Andres Dominguez, Feliciana Dominguez, Esteban Dominguez, Maria Dominguez, Pedro Dominguez, Jose Dominguez, Maria, widow

of Manuel Rocha, and Antonio Jacinto Rocha, and to their heirs, the tract of land embraced and described in the foregoing survey, 'in the respective shares and proportions which they hold in the premises,' 'by title deduced from Christobel Dominguez, deceased, by heirship or by mesne conveyances'; but with the stipulation that in virtue of the 15th Section of the said Act, the confirmation of this said claim, and this patent, 'shall not affect the interests of third persons.'

"To Have and To Hold the said tract, with the appurtenances, in the respective shares and proportion, and with the stipulation aforesaid, unto the said Manuel Dominguez, Concepcion Rocha, Bernardino Rocha, Jose Antonio Aguina, Maria Jesus Cota de Dominguez, Madalina Dominguez, Andres Dominguez, Felliciana Dominguez, Esteban Dominguez, Maria Dominguez, Pedro Dominguez, Jose Dominguez, Maria, widow of Manuel Rocha, and Antonio Jacinto Rocha, and to their heirs and assigns forever."

From the date the patent was issued in 1858 until the present time, the United States has not asserted claim to any mineral interest in the land described in the patent. Apparently the area has been used and developed on the theory that the patentees obtained a full fee title. An exhibit offered in evidence by the defendant indicates that this particular area is in the heart of one of California's richest oil producing fields.

On February 26, 1937, the plaintiff applied to the United States Land Office in Los Angeles for an oil and gas lease on some of the lands included in the Dominguez (or San Pedro) patent described as Sec. 4, Township 5 South, Range 13 West Los Angeles County. This application was rejected on April 2, 1937, by the Commissioner of the General Land Office on the ground that the land was "embraced in confirmed private land claims title to which has long since passed from the Government by patent.

The Department has no jurisdiction over such lands and no authority to issue an oil and gas lease covering the same."

A rehearing was granted on May 12, 1937, following which briefs were filed by parties in interest but no decision was rendered for some twelve years. This delay was due primarily to the intervening "off shore oil" litigation. On April 8, 1949, an opinion was issued by the Solicitor of the Department of the Interior acting for the Secretary, denying the rehearing application. An application for reconsideration was filed on July 5, 1949, which was rejected on July 12, 1949. This suit followed on April 16, 1952.

## Plaintiff's Contentions

Plaintiff contends that the United States patent did not convey the minerals beneath the soil in the land described to the patentees for the reason that the Treaty of Guadalupe Hidalgo and the Protocol of Querétaro provided for the confirmation by the United States of legitimate titles under Mexican law in California up to May, 1846; that under Mexican law the ownership of agrarian land did not include the mines or minerals below the surface, but that these belonged to the sovereign; that the claim of Dominguez et al., which includes the land involved in these proceedings, was a claim of title to agricultural land and did not constitute a claim to the minerals therein, which under Mexican law belonged to the sovereign; that the Act of March 3, 1851, provided only for confirmation of existing titles to property under Mexican law and did not include the power to convey to a claimant out of the Public Domain of the United States more property than such claimant owned under Mexican law; that the United States acquired by cession all the rights and property of the Republic of Mexico and California including the minerals beneath the surface of the Dominguez grant, and that since title thereto has never been conveyed but remains in the United States, the plaintiff acquired the right to a lease of the minerals in the

land described in his Application of February 26, 1937.

### Defendant's Contentions

The defendant contends that the patent issued under the Act of March 3, 1851 and the proceedings which were held incident to the issuance of said patent carried with it title to the oil, gas and minerals and that the United States does not own any interest in the land described in plaintiff's application which could properly be the subject of a Federal oil and gas lease; that since the patent was issued the United States has made no attempt to claim any mineral interest in the land described and the area has been used and developed on the theory that the patentee obtained a full fee title; that this particular area is in the heart of one of California's richest producing oil fields and that this suit would gravely interfere with title claims which have been in existence for a long period of time; also, that as against the United States, or those claiming under it, a patent under the 1851 Act operates as a quit claim, and that one holding a patent under the 1851 Act has uniformly been held to have a conclusive title against the United States or anyone tracing his claim to the United States; that the legislative history of the 1851 Act confirms the conclusion that patents issued thereunder conveyed the minerals; and that while there have been no earlier Interior Department decisions on the precise subject, there seems to be no question that the defendant's predecessors in title have consistently concluded that the United States did not own the minerals and lands patented under the 1851 Act; that earlier Secretaries of the Interior at no time have suggested that action should be taken to assert a claim of title to these minerals and, therefore, this case is subject to the rule that courts should regard long continued and uniform practice of the officers charged with the duty of administering the law as persuasively determinative of its construction.

### Opinion

The question to be decided in this case is whether or not the patent dated December 18, 1858, to Manuel Dominguez et al., and issued pursuant to the provisions of the Act of March 3, 1851, conveyed title to the minerals beneath the soil in the land described in the patent.

It seems clear that, as plaintiff contends, under Spanish and Mexican law, no interest in the minerals passed by grant from the Mexican Government of the land in which they were contained, without express words designating them. The United States v. Andres Castillero, 2 Black 17, 17 L.Ed. 360; Moore v. Smaw, 17 Cal. 199. In view of this fact, it may be argued in support of the plaintiff's position that, since the claim of Dominguez et al. was a claim of title to agricultural land and did not constitute a claim to the minerals therein, the patent issued pursuant to the provisions of the Act of March 3, 1851, only confirmed the title of the claimants to the agricultural land and did not convey title to the mines or minerals below the surface.

However, such a ruling would run counter to a long line of authorities which either directly or indirectly support a contrary view and would do violence to the purpose of the Act of March 3, 1851, to settle private land claims in the State of California based on Mexican and Spanish grants and not to leave such titles in their former indefinite position.

The contentions made by the plaintiff in this suit were raised as long ago as 1861, and decided adversely to the position here taken by the plaintiff, in the case of Moore v. Smaw, 17 Cal. 199, written by Chief Justice Field of that Court, later Mr. Justice Field of the Supreme Court of the United States, in which the Court held that consistent with the purposes of the Act of March 3, 1851, the effect of a patent under said Act was to divest the United States of any and all interest in the land, including the minerals which it may have acquired from Mexico under the Treaty.

While the precise issue raised in this pending suit appears not to have been raised in any prior litigation in any Federal Court so as to be directly passed upon, the Moore decision has never been questioned and it has been cited with approval in other cases, although not with respect to the issue involved in this proceeding. Burke v. Southern Pacific Railroad, 234 U.S. 669, 689, 34 S.Ct. 907, 58 L.Ed. 1527; United States v. State of Texas, 339 U.S. 707, 709, 70 S.Ct. 918, 94 L.Ed. 1221.

The Dominguez claim was the subject of an elaborate opinion by the Supreme Court of the United States in Dominguez De Guyer v. Banning, 167 U.S. 723, 17 S.Ct. 937, 42 L.Ed. 340, written by Mr. Justice Harlan, in which the history of the claim is recited in detail and, while the Court in that case did not have before it the issue now under consideration, it did hold that the description in the patent controlled and from this holding it is reasonable to conclude that the patent issued on December 18, 1858, embraced all of the land, including the minerals under the surface, to the patentees therein named.

In the case of Beard v. Federy, 3 Wall. 478, 18 L.Ed. 88, the Supreme Court held that a patent issued pursuant to the provisions of the Act of March 3, 1851, is "a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners."

In Fremont v. United States, 17 How. 542, 15 L.Ed. 241, the Court also had the Act of March 3, 1851, under consideration and pointed out that the Eighth Section of the Act "embraces not only inchoate or equitable titles, but legal titles also; and requires them all to undergo examination and to be passed upon by the Court. The object of this provision appears to be, to place the titles in land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of the country, in a manner and form that will prevent future controversy."

In Interstate Land Co. v. Maxwell Land Co., 139 U.S. 569, 11 S.Ct. 656, 35 L.Ed. 278, the Supreme Court again had before it the question of the effect of a patent covering land acquired from Mexico by the Treaty of Guadalupe Hidalgo, and the Court said, 139 U.S. at page 580, 11 S.Ct. at page 660:

"The confirmation and patenting of the grant to Beaubien and Miranda operated to divest the United States of all their rights to the land embraced in the grant which this country acquired from Mexico by the treaty of Guadalupe Hidalgo. And the only way that that grant can be defeated now is to show that the lands embraced in it had been previously granted by the Mexican government to some other person."

In United States v. O'Donnell, 303 U.S. 501, 512, 58 S.Ct. 708, 715, 82 L.Ed. 980, in which the history of the Act of March 3, 1851, is set out in detail, the Court said:

"The primary purpose of the Mexican Claims Act was the performance by the United States of its treaty obligations to quiet the titles of the claimants under Spanish and Mexican grants. But a necessary consequence of proceeding before the Commission, and one incidental to the determination of the validity of the titles of such claimants, was a determination whether, by the cession, the lands in question had become a part of the public domain of the United States. It is evident that the treaty obligations to quiet the title of claimants under Mexican grants would be defeated and the Mexican Claims Act would fail of its purpose if the finality of the Board's confirmation of claims under Mexican grants could be challenged by persons claiming under grants of public lands by the United States. For that reason it has been consistently held that claimants under the United States, by virtue of statutes

disposing of its public lands in California, are not 'third persons' within the meaning of the Mexican Claims Act, and that confirmation under that act of claims under Mexican grants is conclusive upon all those claiming under the United States."

In Adam v. Norris, 103 U.S. 591, 593, 26 L.Ed. 583, the Court said:

"But the United States, in dealing with parties claiming, under Mexican grants, lands within the territory ceded by the treaty of Mexico, never made pretense that it was the owner of them. When, therefore, guided by the action of the tribunals established to pass upon the validity of these alleged grants, the Government issued a patent it was in the nature of a quit claim,—an admission that the rightful ownership had never been in the United States, but had passed at the time of the cession to the claimant, or to those under whom he claimed. This principle has been more than once clearly announced in this Court. (Citing cases.)"

The case of Ely Real Estate & Investment Company v. Watts, 9 Cir., 262 F. 721, 726, which related to the Gadsden Treaty with Mexico of December 30, 1853, 10 Stat. 1031, under which the United States acquired that portion of Arizona involved in the proceeding, required consideration of the Treaty of Guadalupe Hidalgo and the Court discussed at length the provisions of the Act of March 3, 1851, particularly Sec. 15 thereof. In the opinion written by Circuit Judge Gilbert, after reviewing a number of authorities, the Court said:

"It has been held in numerous decisions that the patent issued upon a confirmed Mexican grant is to be regarded in two aspects: First, it is a quitclaim deed from the United States, which takes effect by relation at the time when proceedings were instituted by the filing of the petition with the commission or court created to adjudicate the claim; second, it is a record of the government, showing its judgment with respect to the title of the patentee at the date of the cession. [Citing cases.]"

Other authorities which, while not directly in point, lend support to the conclusions herein expressed, are Botiller v. Dominguez, 130 U.S. 238, 9 S.Ct. 525, 32 L.Ed. 926; United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L. Ed. 747; United States v. Coronado Beach Co., 255 U.S. 472, 41 S.Ct. 378, 65 L.Ed. 736; Work v. Mason, 55 App.D.C. 349, 6 F.2d 474; Hogan v. United States, 9 Cir., 72 F.2d 799; Los Angeles and Salt Lake Railroad Company v. United States, 9 Cir., 140 F.2d 436; Leese v. Clark, 20 Cal. 388, 423.

The claim filed by the heirs of Christobel Dominguez claimed "in fee simple a certain tract of land situate in the County of Los Angeles, known by the name of 'San Pedro' containing ten square leagues, more or less", and went on to state that Christobel Dominguez "died seized in fee thereof", and then the petitioners "aver they claim in fee the said Rancho San Pedro as tenants in common * * *." The patent issued gave and granted "the tract of land embraced and described in the foregoing survey".

In the light of the foregoing authorities, it is my conclusion that the patent herein described and issued pursuant to the provisions of the Act of March 3, 1851, did convey title to the minerals beneath the soil in the land described in the patent; that the patentees acquired a conclusive title against the United States or anyone tracing his claim to the United States; that the defendant correctly ruled that the United States does not own the minerals in the lands described in the lease application and, therefore, the plaintiff is not entitled to the relief demanded.

Counsel for the defendant will submit an appropriate order in conformity with the foregoing.