[L. A. No. 1608. Department Two.—May 15, 1907.]

BOLSA LAND COMPANY, and BOLSA CHICA GUN CLUB, Appellants, v. WILL BURDICK et al., Defendants.

INJUNCTION—GAME PRESERVE—CONSPIRACY TO TRESPASS.—An injunction will lie, at the instance of the owners of an inclosed tract of land used as a game preserve, to restrain a large number of persons who were acting under an agreement and conspiracy between themselves from entering upon the land and committing continuous trespass thereon.

ID.—NAVIGABLE WATERS—INVASION OF PRIVATE LAND.—The public has no right to invade and cross private lands in order to reach navigable waters for the purpose of there hunting and fishing.

ID.—DRAINAGE DITCH NOT NAVIGABLE STREAM—DESTRUCTION OF FENCES ACROSS.—An artificial ditch, emptying into an estuary of the ocean, the right to construct and maintain which was granted by the owners of the preserve to the county solely for the purposes of drainage, is not a navigable stream over which the public have the right to travel in order to reach navigable waters entirely surrounded by the lands of the preserve. Neither the county nor the public have the right to destroy fences erected by the owner of the land across such ditch or along the right of way thereof which do not interfere with the drainage capacity of the ditch.

ID.—RIGHT OF STATE TO SELL WATER-COVERED LAND.—The state, subject
to the paramount control of the general government touching matters
of navigation and commerce, has the right to sell into private
ownership any of its water-covered lands, the limitation upon its
power in this regard being that such sales shall be in aid of, or at
least not in derogation of, its governmental trust to preserve needed
navigable waters for the benefit of its people.  The state is not
required to preserve the navigability of its waters for the use of
the public who may desire to shoot wild game thereon.

APPEAL from an order of the Superior Court of Orange
County dissolving a preliminary injunction. Z. B. West,
Judge.

The facts are stated in the opinion of the court.

Dunn & Crutcher, and Scarborough & Forgy, for Appel-
lants.

F. O. Daniel, and Clyde Bishop, for Respondents.

HENSHAW, J.—Plaintiffs' complaint alleged that the
Bolsa Land Company was the owner of the land in the com-
plaint described, and with the Bolsa Chica Gun Club, a cor-
poration, the members of which were the same as the members
of the Bolsa Land Company, were in possession of it.  This
tract of land, comprising several thousand acres, was wholly
inclosed by a fence surrounding its exterior boundaries.  With-
in the inclosure, and near the center of the tract, were
numerous sloughs, artificial ponds, and overflowed swamp-
lands.  These ponds, sloughs, and swamp-lands were fre-
quented by wild fowl—ducks, geese, snipe, etc.  The plain-
tiffs had improved these lands and constructed thereon con-
veniences for shooting purposes, and used these ponds,
sloughs, and overflowed lands for such purposes as a preserve
for its members and stockholders.  To give notice and to pro-
tect these lands, the plaintiffs had posted notices along the
fence surrounding the tract.  It is then alleged that the defend-
ants, who are many, are strangers to the property and have
absolutely no rights or interests therein, but, notwithstanding,
have at numerous times, by force and violence, broken down
plaintiffs' fences, entered upon the land, hunted, shot, killed,
and carried away large numbers of the wild fowl found

thereon, and that, although personally notified to refrain from trespassing upon the land, the defendants paid no heed to such notification, but declared their intention to return and enter upon the land whenever they chose to do so, and in particular declared that they would return upon the twenty-sixth day of November (which day was Thanksgiving day) and enter upon the premises and shoot and kill the wild fowl which they might find there. It is further alleged that the effect of such indiscriminate shooting was to drive the birds away from the lands and to destroy the value of the lands as a game resort and preserve. It was also charged in the complaint that these defendants were acting under agreement and conspiracy so to trespass upon the lands of plaintiffs and commit the unlawful acts charged. Plaintiffs prayed that an injunction might be issued upon the filing of the complaint, restraining the defendants from entering upon the land and trespassing thereon, and that at the trial of the cause the injunction be made permanent. Upon the filing of the complaint the court made its order directing the issuance of a preliminary injunction, and fixed the amount of the bond thereon, which plaintiffs gave as required. The writ of injunction was then issued and served upon the numerous defendants. Thereafter the defendants came into court and filed their answer and served notice of a motion to dissolve the preliminary injunction upon the records of the case and upon accompanying affidavits attached to the notice. This motion was presented to the court, together with affidavits, and plaintiffs in turn filed counter-affidavits. Besides these affidavits, they presented documentary evidence, both in support of their title and in opposition to certain asserted rights of defendants, which will hereinafter be more specifically adverted to.

The court thereupon dissolved the preliminary injunction, and plaintiffs appeal.

It is plain that this complaint is in all respects like that of *Kellog* v. *King*, 114 Cal. 378, [55 Am. St. Rep. 74, 46 Pac. 166]. An injunction is the principal relief sought. A preliminary injunction, under the allegations of the complaint, was not only proper but necessary to protect the plaintiffs' rights and to prevent the alleged prospective destruction of their game preserve. The question here presented is whether,

under the showing made by the answer, and the affidavits in support of the motion to dissolve, taken with the opposing evidence offered by plaintiffs, the motion was properly granted. Without attempting to set forth at length the matter of this evidence, its substance may be summarized briefly. There is no serious attempt to deny the acts charged against the defendants generally. Affidavits of individual defendants make specific denials in some instances, but certain facts are established substantially beyond question. The defendants did, in great numbers and upon many occasions, break down the fences and enter upon plaintiffs' inclosure, overrunning the lands, on foot, as well as traversing the waters by boat, carrying firearms, discharging them at will, shooting birds, refusing to heed warnings and notices of plaintiffs' employees, and in at least one instance, that of defendant Barton, threatening to murder. They did do these things (excepting the threat to murder) by agreement and preconcert of action, but they deny that a conspiracy existed, and assert that their agreement went only to the exercise of their legal rights upon the premises. They do not deny the breaking down of plaintiffs' fences, but assert that in so doing they were but removing obstructions in a navigable stream. In short, upon the nature of their acts, the summing up may be made in the language of respondents' brief: "'There has for several years been a kind of scrambling contention between appellants and the citizens and residents of the community of Bolsas Bay as to the right of the general public to go upon the said water since the time when the plaintiffs claim to have procured the conveyance of the same; the people in the neighborhood, including many of these defendants, claiming that they had the same rights upon the water that they had before the conveyance or patent was made by the state, and that the plaintiffs had no legal right to build the dam across the mouth of said bay or to fence said waters, and this controversy has arisen because of these contentions." Such being the admitted attitude of the defendants, it needs but little knowledge, and no discernment, to perceive that they were using at least the waters of this preserve in all respects as though their rights thereon were the same as the plaintiffs. Thus, no substantial denial is made of the fact that some forty or fifty of them overran the

CLI Cal.—17

lands and waters upon November 26th, all carrying guns, all discharging them freely and shooting game. Yet the affidavits on this point would seek to have the court believe that they were there upon that occasion as invited guests of the plaintiffs, called to an amicable conference to adjust their differences. Just why some forty or fifty should have come to the conference, instead of one or two spokesmen and leaders, just why, in coming to this conference, they should have carried shotguns and tramped the marshes shooting at game, and just why they should never have attended, nor have sought to attend, this proposed conference, is of course, nowhere explained.

So much for the acts of the defendants, which acts, it may not be questioned, constituted such an invasion of plaintiffs' asserted rights as to have justified the continuance of the preliminary injunction.

As to the title and right of possession of the property, plaintiffs showed that the lands were part of a rancho to which patent had been issued by the United States. The plaintiffs' title was derived by mesne conveyance through the holders of the patented title. The lands comprised many hundreds of acres of upland as well as marsh lands, with an ocean frontage. An estuary from the ocean projected into these lands, the waters in which estuary, with its tributary sloughs, were affected by the flow of the tides. To the lands covered by all of these waters, the plaintiffs had acquired title by patent from the state of California under an act to provide for the management and sale of lands belonging to the state, approved March 28, 1868. (Stats. 1867-1868, p. 507.) As to their allegations of exclusive possession and right of possession, and the insufficiency of defendants' denial thereof, defendants' answer thereto, as taken from respondents' brief, is that "defendants being only laymen, are not supposed to know whether in law such possession as plaintiffs had amounted to exclusive possession, nor whether they were entitled to possession." No comment upon this seems necessary.

It further appeared, without contradiction, that from the upper reaches of land, fresh water drained down into these sloughs and into Bolsas Bay, as a widening of this estuary was named, and that plaintiffs had constructed a dam across

a narrow neck of the estuary to confine these waters, and by floodgate permitted the surplus waters to escape through an artificial channel into the ocean. Direct communication with the ocean was thus cut off, the water became inland waters not subject to the tides, and were and are wholly inclosed by the lands claimed by plaintiffs under their patents and deeds. Defendants assert that these waters were and are navigable waters, and that they have a right which they enjoy as members of the public, in common with the public and not otherwise, to go upon navigable waters to take fish and to kill wild fowl—rights which unquestionably are enjoyed by the public in the navigable waters of the state or nation. But, as these so-called navigable waters are wholly surrounded by the lands of plaintiff, and as it is not asserted, and, indeed, it would require much rashness and temerity to assert, that the public has a right to invade and cross private lands to reach navigable waters, a lawful mode of ingress and approach to these navigable waters became necessary. This was conveniently at hand for defendants in the "Freeman River." Freeman River they declare is a navigable stream of water flowing into Bolsas Bay. It is down this navigable river they assert that they propelled their boats to its junction with that bay, and the only fences which they destroyed were fences which crossed this river and obstructed its navigability —mere purprestures. Such an invasion and destruction of the navigability of a stream should receive, as it would merit, the severest condemnation; but that condemnation would be unjust, and must be withheld in this case, in view of the facts. By them it is shown, indisputably, that "Freeman River" is a mere drainage ditch, the right to construct and maintain which was granted to the county of Orange by plaintiffs' predecessors in interest. This ditch, as actually existing, is from twelve to fifteen feet wide and of a depth in some places of less than two feet. Growing vegetation so fills and clogs it that frequent cleanings are necessary. It is not possible to row even a light skiff down it, but it is possible at times to pole such a boat. It was where this ditch enters the lands of plaintiffs that across it a continuous fence had been erected, and it was this fence across the ditch and for fifteen or thirty feet each side of it upon the right of way granted to the county of Orange for the

maintenance of the ditch, that defendants, acting within their asserted rights to remove purprestures from navigable waters, destroyed the fence. Moreover, the meander lines of the United States patent crossed this so-called Freeman River at its mouth or junction with a tributary slough of Bolsas Bay. The whole length, therefore, of this Freeman River or ditch was conveyed into private ownership by this patent, which thus contains a distinct negation of the claim of navigability.

It should be unnecessary to add that the contention that such a ditch constitutes a part of the navigable waters of the state, or of the nation, is a sham as shallow as the ditch itself. The county of Orange had no right to use the ditch and the right of way which went with it, except for the purposes of the grant—that of drainage. The county of Orange itself could not interfere with the fences of plaintiff, unless those fences themselves interfered with the drainage capacity of the ditch, and, even then, their interference would be limited to removing such obstructions as did in fact interfere with the drainage. The unlawful acts of W. W. Barton, John Blaylock, and other of the defendants, who cut down and destroyed the fences across the ditch and upon the right of way thirty feet upon each side thereof, are wholly without justification. They were acts which the county of Orange could not do, and the doing of which by another it could not authorize.

As defendants, therefore, had no right of entry upon the lands of plaintiffs by the route which they took, and as this is the only method of approach to the so-called navigable waters to which they assert any right, it necessarily follows, aside from the question of the navigability of the waters of the inclosed Bolsas Bay, that defendants were trespassers. Whether or not Bolsas Bay ever was, or, if it ever was, whether it is now, part of the navigable waters of the state, defendants certainly have no right to invade private property to gain access thereto. If to approach such waters a right of way becomes necessary over private lands, such right of way does not run to the public with the use of the waters. It must be condemned and paid for by the public, as must any other right of way for public use.

As to the question of the navigability or non-navigability of these waters, little need be said, and that little would not be said were it not for the fact that the court, in dissolving the preliminary injunction would seem to have concluded that these waters were navigable. As has heretofore been stated, the right of the public to the use of the navigable waters of the state under proper restrictions by the state, for purposes of navigation and fishery is unquestioned. So also and under like restrictions will go unquestioned the right of the public to take other kinds of game upon such waters While it is true, therefore, that one may take fish and shoot birds upon navigable waters, and while it is true also that one may go with boats thereon, the converse of these propositions is far from being true. Though the belief seems to be somewhat widely held, it is not true that wherever one may catch fish the waters are navigable, or that wherever one may row or pole a boat he has the right to do so because of the navigability of the water. Nor, it may be added, while dealing with these popular fallacies, is it true that one may go with his boat wherever the tides ebb and flow, upon the theory that wherever the tides ebb and flow waters are navigable. Still less is it true that the state may not convey lands under waters which are between high and low tide into private ownership. It may not only do this, but it may also convey lands which are perpetually covered by the tides. As to lands wholly covered by the waters of the ocean, it is sufficient to instance the fact, that in the city and county of San Francisco, land to the value of millions of dollars is made up by the actual filling in of the bay of San Francisco, and, as the supreme court of the United States has said, he would indeed be a rash advocate who should assert that the titles to these lands were not good because originally they were perpetually covered by the navigable waters of the bay. The state has sold into private ownership thousands and tens of thousands of acres of its swamp and overflowed lands adjacent to the shores of the ocean and its navigable bays, like Humboldt Bay and the bay of San Francisco. To reclaim these lands the construction of levees has been necessary, and the building of these levees has imperatively called for the erection of dams across minor sloughs and estuaries, thus cutting them off

from their original ocean or bay connections. So long as this work does not, in the view of the state or nation, interfere with the navigability of the remaining waters, no individual has cause of complaint. It is for the state, and not for the individual, to say whether its interests are best subserved by the damming or filling such creeks, sloughs, or estuaries. The simple truth of the matter is that the state, always, of course, subject to the paramount control of the general government touching matters of navigation and commerce, has the right to sell into private ownership any of these water-covered lands, the limitation upon its power in this regard being that such sales shall be in aid. of, or at least not in derogation of its governmental trust to preserve needed navigable waters for the benefit of its people. (*Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, [13 Sup. Ct. 110].) The state, therefore, is not called upon to preserve the navigability of its waters because the public may desire to shoot wild game thereon. The state is interested in preserving the navigability of waters in the aid of commerce. And in such a case as this, where the so-called navigable waters begin and end wholly within the limits of private property, such waters are no more useful for navigation than is a duck pond in a man's back yard, over which pond a skiff may be propelled. What is here said is not to be construed as a determination of the validity or invalidity of the state patent. That question is not before us. It is but an enunciation of the general principle of the power of the state, in appropriate cases, to make grants of water-covered lands. As to the dam constructed by plaintiffs under color of title and authority which they derived from the state's patents to all these water-covered lands, it is sufficient to say that, from the showing here made, if it be a purpresture, it may be abated only at the instance of the state or national government. It cannot be said to interfere with the right of navigation of defendants, since the waters which it confines are wholly inclosed by the lands of the plaintiffs.

Indeed, respondents themselves assert that "the question of title could not be adjudicated upon a motion to dissolve." It is sufficient, therefore, to say, as indisputably appears, that plaintiffs' patents give them color of title, and they

unquestionably have and have been exercising a right of possession; that the implied finding of the navigability of Freeman River is unfounded, and that defendants have no right of ingress upon plaintiffs' land by means of this irrigating ditch; that they have failed to show any other right of ingress. Their claim of right as members of the general public to enter upon the lands of plaintiffs, therefore, falls to the ground, and the court erred in dissolving the preliminary injunction. For which reason the order is reversed, with directions to the trial court to restore the preliminary injunction pending the trial and final determination by the court of the questions involved.

Lorigan, J., and Beatty, C. J., concurred.

Hearing in Bank denied.