[L. A. Nos. 5254, 5255. In Bank.—April 8, 1920.]

THE CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. SAN PEDRO, LOS ANGELES & SALT LAKE RAILROAD COMPANY (a Corporation), Appellant.

[1] Public Lands—Lands Bordering upon Navigable Waters—Purpose of Meander Lines.—Meander lines are run in surveying public lands bordering upon navigable rivers, not as boundaries of the tract, but to ascertain the quantity of the land subject to sale, and the watercourse, and not the meander line, as actually run on the land, is the boundary.

[2] Id.—Watercourse, When Boundary.—Where the calls in a conveyance of land are for two corners at, in, or on a stream or its bank, and there, is an immediate line extending from one such corner to the other, the stream is the boundary, unless there is something showing that the intention of the parties was otherwise.

[3] Id.—Construction of Patent—Exclusion of Land Below High Tide.—A patent should ordinarily be construed as excluding therefrom land below the high-tide line.

[4] Id.—Construction in Favor of Grantor.—Every grant by the sovereign is construed strongly in favor of the grantor.

[5] Id.—Tide-lands Within Rancho San Pedro—Construction of United States Patent—Lines Defining Exception of "Inner Bay of San Pedro."—In these actions brought by the city of Los Angeles to quiet title to certain tide-lands at San Pedro, wherein the defendant predicated its right to the lands upon a United States patent of the San Pedro Rancho issued in 1858 in confirmation of a Mexican grant prior to the year 1809, and wherein the sole question for determination was whether or not the lines of the patent defining the "inner bay of San Pedro exception" were meander lines of the inner bay within the meaning of the rule which makes the shore line of such bay the actual boundary line where the intent is to meander such shore, it is held that the mean high-tide line of San Pedro Bay was the boundary between the land conveyed and the land retained by the government, and that therefore the claim of the plaintiff to the tide-lands as successors of the government was valid.

---

1. Meander lines as boundaries, notes, 27 Am. St. Rep. 59; 42 L. R. A. 502.

3. Effect of bounding grant on river or tide water, note, 42 L. R. A. 502.

APPEALS from judgments of the Superior Court of Los Angeles County. Lewis R. Works, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. S. Halsted and Oscar Lawler for Appellant.

Albert Lee Stephens, Charles S. Burnell, City Attorneys, Clyde M. Leach, Deputy City Attorney, and Anderson & Anderson for Respondent.

WILBUR, J.—These actions were brought by the city of Los Angeles to quiet title to certain tide-lands at San Pedro. The state of California, by an act of the state legislature in 1911, ceded to the city of Los Angeles certain lands held by the state by virtue of its sovereignty in and around the bay of San Pedro. Defendant predicates its right to the lands involved herein upon a United States patent of the San Pedro Rancho. This patent was issued in 1858 and was in confirmation of a Mexican grant prior to the year 1809. The patent contains a description by metes and bounds and has attached thereto a plat. We are concerned in this case only with the proper interpretation of such description and plat. The description in the patent first delimits the exterior boundaries of the Rancho San Pedro; such boundaries cross the inner bay of San Pedro and the entrance thereto, thus including within such exterior boundaries a large portion of the inner bay of San Pedro, the balance being contained in the Rancho Palo Verde to the west. The "inner bay of San Pedro" is, however, excepted by a description, the interpretation of which forms the basis of this controversy. All the parcels of the tide-lands to which the city seeks to quiet its title lie outside of the lines of the inner bay exception and within the Rancho San Pedro as described in the patent, if the courses and distances of the inner bay exception are treated as boundary lines of such exception and rancho. If, however, the shore line of the bay at mean high tide is the boundary then the lands are excluded by the inner bay exception, and were therefore reserved to the state, and now belong to the city as trustee for the public.

The sole question, then, for determination by this court is whether or not the lines of the patent defining the inner bay exception are meander lines of the inner bay within the meaning of the rule which makes the shore line of that bay the actual boundary line where the intent is to meander such shore. **[1]** The law is thus stated in the syllabus to the opinion of the supreme court of the United States in *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178, [33 L. Ed. 872, 10 Sup. Ct. Rep. 523, see, also, Rose's U. S. Notes]: "Meander lines are run in surveying public lands bordering upon navigable rivers, not as boundaries of the tract, but to ascertain the quantity of the land subject to sale; and the watercourse, and not the meander line, as actually run on the land, is the boundary." See, also, *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, [19 L. Ed. 74]. In *County of St. Clair* v. *Lovingston*, 23 Wall. 46-64, [23 L. Ed. 59, see, also, Rose's U. S. Notes], it is said: "It may be considered a canon in American jurisprudence that **[2]** where the calls in a conveyance /of land are for two corners at, in or on a stream or its bank, and there is an immediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise." See, also, *City of St. Louis* v. *Rutz*, 138 U. S. 226, [34 L. Ed. 941, 11 Sup. Ct. Rep. 337, see, also, Rose's U. S. Notes] ; *Hardin* v. *Jordan*, 140 U. S. 371, [35 L. Ed. 428, 11 Sup. Ct. Rep. 808, 838] ; *Producers Oil Co.* v. *Hanzen*, 238 U. S. 325, [59 L. Ed. 1330, 35 Sup. Ct. Rep. 755]. In addition to this rule of interpretation there are two others which bear upon the situation now under consideration. **[3]** The first is that a patent should ordinarily be construed as excluding therefrom land below the high-tide line. The rule is thus stated in *Wright* v. *Seymour*, 69 Cal. 122, 126, [10 Pac. 323] : "The lands under water where the tide ebbs and flows belong to the state by virtue of her sovereignty, and in the absence of an express showing to the contrary it will not be presumed that the government of the United States intended to convey it. . . . We must assume that the government discharged its obligation to the holder of the Mexican title by receiving proof of its character and the land to which it related, and that upon confirmation the patent is-

sued to the claimant is the evidence and only evidence of the extent of the grant, and the terms used in such patent relating to extent and boundaries are subject to like rules of construction with other grants from the government. Had the government found the claimant entitled to the bed and banks of a tide-water stream, we must suppose it would have used in the patent apt words for its conveyance. Not having done so, the presumption is, that it was not intended to convey the bed of the stream.'' It is equally well settled that a grant from the sovereign of land bounded by the sea or by any navigable tide water does not pass any title below high-water mark unless either the language of the grant or long usage under it clearly indicates that such was the intention. [4] The other rule of interpretation is a corollary thereto, namely, that every grant by the sovereign is construed strongly in favor of the grantor. The rule is thus stated in section 1069 of the Civil Code: ''A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor.'' This rule of construction was applied by the supreme court of the United States in *Shively* v. *Bowlby,* 152 U. S. 1, [38 L. Ed. 331, 14 Sup. Ct. Rep. 548, see, also, Rose's U. S. Notes], where it was said: ''It was argued for the defendants in error that the question presented was a mere question of construction of a grant bounded by tide water, and would have been the same as it is if the grantor had been a private person. But this is not so. The rule of construction in the case of such a grant from the sovereign is quite different from that which governs private grants. The familiar rule and its chief foundation were felicitously expressed by Sir William Scott: 'All grants of the Crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights and emoluments are diminished by any grant, beyond what such grant by necessary and unavoidable construction shall take away.' ''

The controversy here must be determined by the application of these well-established rules of construction to the

patent in question. The patent and the accompanying plat are to be construed together. The plat showed the exterior boundaries of the rancho, and within the boundaries of the rancho a body of water marked "Inner bay of San Pedro (Exception)." Every one of the fifteen stations of the line delimiting this bay appear from the map thereof to be upon the shore line of the bay as such line is drawn upon the plat. The stations of the inner bay exceptions are marked "I. B." Between stations IB 12 and IB 16 of the inner bay exception survey the plat shows some land lying within the bay between the shore line and the surveyed lines. The plat not only shows that all the water of the bay is within the excepted area but some of the high land also; whereas this controversy is based upon the fact, now ascertained and admitted, that the shore line at the places here in controversy lies entirely outside these meander or survey lines. In other words, while the meander lines purport to include the whole of the bay and, in addition, some of the upland, the fact is that the shore line lies outside of the meander lines and the exception lines do not include all the water. The plat, under the head of "Traverse of the inner bay of San Pedro to be excluded from survey of the claim," gives a table of the same courses and distances which are used in the description thereof in the patent. Upon the plat is the following statement: "Area within the exterior lines of the confirmed grant 44,219.72 acres; area within the lines '1' to '16' *being the lands covered by the navigable waters of the 'Inner Bay of San Pedro' connected with the ocean and therefore to be excluded* 1,100.59 acres; included in the boundaries specified by the confirmatory decree *exclusive of the Bay* 43,119.13 acres." Thus the plat, by delineation of the boundaries, and by express exception of the "navigable waters of the inner bay," which because connected with the ocean are "therefore to be excluded," indicates the intention of the government, to exclude from the lands granted the "navigable waters of the inner bay." It would thus appear that it was the intention to except from the patented lands the entire surface of the inner bay. The uncertainty in the case arises from the fact that the plat accompanying the survey does not correctly delineate the shore line of the bay at mean high tide. The

description contained in the patent, so far as it relates to the controversy, is as follows:

"Excepting, reserving and excluding from the tract as thus surveyed that portion thereof covered by the navigable waters of the Inner Bay of San Pedro, and which are included within the following described lines, to wit:

"Beginning at the stake on the high water line of the Inner Bay of San Pedro on the line between stations 23 and 24 of the survey of the Rancho, and which stake is 212 chains south 7° 32' east from said station number 23;

1. "Thence according to the true meridian (the variation of magnetic needle being 13° 30' east) along the high water line of the Inner Bay of San Pedro, south 80° 45' east 10 chains and 84 links to station;

2. "Thence south 89° 45' east 9 chains to station;

3. "Thence north 76° 45' east 25 chains to station;

4. "Thence south 77° (and) 45' 8 chains and 90 links to station;

5. "Thence south 15' west 6 chains and 50 links to station;

6. "Thence south 72° 15' east 15 chains to station;

7. "Thence south 68° 15' east 16 chains to station;

8. "Thence north 24° 45' east 14 chains and 13 links to station;

9. "Thence north 46° 45' east 11 chains and 50 links to station;

10. "Thence north 69° 45' east 11 chains 50 links to station;

11. "Thence north 58° 15' east 16 chains to station;

12. "Thence south 34° east at 9 chains crosses a slough 4 chains wide, course northeast; 59 chains crosses a slough 3 chains wide, course east and to station at sand hills;

13. "Thence south 67° west 76 chains and 50 links to station;

14. "Thence south 34° 45' west 98 chains to station No. 25 of survey of exterior boundaries.

15. "Thence north 31° 30' west, crossing the channel or entrance to the Bay, 19 chains and 44 links to 'La Goleta' exterior boundary, station No. 24;

16. "Thence north 7° 32' west, crossing the said 'Inner Bay' 125 chains and 20 links, to the stake 16 on the high water line of the Bay, and commencement of this survey thereof; containing, exclusive of the lands above described as covered by the navigable waters of the 'Inner Bay of

CLXXXII Cal.—42

San Pedro,' 43,119.13 acres; and being designated upon the plats of the public surveys as lots Nos. 37, 38 and 39 in township 3 south of range 12 west, lot No. 37 in township 3 south of range 13 west, lot No. 37 in township 3 south of range 14 West, lot No. 37 township 4 south of range 13 west, lot No. 37 in township 4 south of range 14 west, lot No. 37 in township 4 south of range 15 west, and lot No. 37 in township 5 south of range 13 west, of San Bernardino Meridian Line." The various stations in this inner Bay Exception Survey are known and indicated on the maps in evidence here as "I. B. 1," etc., the eleventh call ending with Inner Bay Station 12 or "I.B.12."

Had the description ended with the word "San Pedro" in the following phrase, "Excepting, reserving and excluding from the tract as thus surveyed that portion thereof covered by the navigable waters of the inner bay of San Pedro," the title to the tide-lands of the bay would unquestionably be in the plaintiff, for the reason that it is thoroughly established that the term "navigable waters" include all waters below the high-tide line, and the phrase thus used is equivalent to the statement "that portion thereof covered by the waters of the inner bay of San Pedro at mean high tide." It should be noted that immediately after the foregoing clause and preceding the description by metes and bounds, is the following phrase "*and* which are included within the following described lines, to wit." The word "and" is significant for the reason that it implies that the former phrase "excepting the navigable waters" is synonymous with the description which followed. Without the word "and" it might be contended that the patent should be construed as though it read. "only that portion of the navigable waters which are included within the following described lines to wit," etc. The inner bay exception survey begins at a stake *on the high-water line of the inner bay of San Pedro* and proceeds, "Thence according to the true meridian *along the high water* line of the inner bay of San Pedro" from station to station until the description "Thence north 31 degrees, 30 minutes crossing the channel or entrance to the bay," and then again the last course which for 125 chains and twenty links crosses the inner bay "to the *stake on the high water line of the bay* and the

commencement of the survey thereof.'' The phrase: ''Containing, exclusive of the lands above described as covered by the navigable waters of the inner bay of San Pedro,'' again indicates an intention to exclude from the patent the navigable waters of the inner bay of San Pedro.

The Rancho Palo Verde lies immediately to the west of the Rancho San Pedro, and a portion of the inner bay is included within exterior boundaries of the latter rancho. This fact accounts for the final course which departs from the high-tide line ''Thence north 7 degrees, 32 minutes west, *crossing said inner bay* 125 chains and 20 links to the stake on the high-water line of the bay and the commencement of this survey thereof. . . . '' (Italics all ours.)

In *Spring* v. *Hewston*, 52 Cal. 442, it was held: ''If the initial point of a boundary is the mouth of a creek, and is described in the conveyance as 'thence ascending the creek,' and several courses and distances are given up the creek, and these courses and distances do not follow but often diverge from the creek, the true boundary line is the creek.'' This reasoning applied to the situation involved in this case would make the phrase ''thence along the high tide line'' modify and affect every one of the courses and distances from the original point of the inner bay exception and make the high-tide line its true boundary. (See, also, *Stoll* v. *Beecher*, 94 Cal. 1, [29 Pac. 327].) The decision of this court in *Freeman* v. *Bellegarde*, 108 Cal. 179, [49 Am. St. Rep. 76, 41 Pac. 289], leads to the same conclusion. There the description was ''thence along the margin of the bay (giving four courses and distances), . . . 11 chains to mouth of creek; thence ascending said creek (giving thirteen courses with their distances) . . . north 45 degrees, west 9 chains, 50 links, crossing the creek to the end of the old wall on north side of marsh.'' The court said: ''The further call in the mortgage and subsequent conveyances, 'thence ascending said creek' must prevail over the courses and distances. The creek is the boundary of the land conveyed, and the courses and distances, being only approximate estimates of the direction and length of the boundary, must yield to the actual line of the creek. When a meandering stream is a boundary it is impracticable for a surveyor to fix monuments in the channel of the water, or to define the actual line of its windings and courses; and in attempting to define

its banks it would be impossible for two surveyors to give the courses and lengths of its several meanders alike." (See, also, *Hendricks* v. *Feather River Canal Co.,* 138 Cal. 423, [71 Pac. 496]; *Railroad Co.* v. *Schurmeir,* 7 Wall. 272, [19 L. Ed. 74, see, also, Rose's U. S. Notes].)

The patent of the San Pedro Rancho has already been before this court and before the supreme court of the United States (*De Guyer* v. *Banning,* 91 Cal. 400, [27 Pac. 761]; 167 U. S. 723, [42 L. Ed. 340, 17 Sup. Ct. Rep. 973]). The question involved was as to the ownership of Mormon Island within the inner bay exception. It was there contended that the decree of confirmation and the patent granted this land to the patentees. This controversy was first decided by this court in favor of the claim of the patentees, but subsequently on rehearing it was held that the patentees were bound by the terms of the patent, and the island therefore did not pass to the patentees. This decree was affirmed by the supreme court of the United States. It is, therefore, now conceded by the parties to this action that the patent controls the rights of the parties. The question litigated in the case of *De Guyer* v. *Banning, supra,* did not involve the exact question now before us. The statements in the opinions of the supreme court of this state and of the United States relating to the "inner bay exception," although *obiter dicta,* are very persuasive as to the meaning of the patent. It is stated (167 U. S. 735, [42 L. Ed. 340, 17 Sup. Ct. Rep. 941]): "The map which accompanied and was made part of the patent of 1858 shows the exterior lines of the survey made under the decree of confirmation. *Those lines include the whole of the inner bay of San Pedro.* The map also shows the exterior lines of the bay itself. But across that part of the map which designates the bay are the words 'inner bay of San Pedro (Exception).' And, as already stated, the map has on its face not only a table showing the exterior lines of the entire boundary run by the surveyor-general, but a table of courses and distances, under the heading, 'Traverse of inner bay of San Pedro to be excluded from survey of the claim.' It is not disputed that Mormon Island is within the exterior lines of this inner bay, and is almost covered with water at high tide. *That the part excluded or excepted from the survey embraced the navigable waters of the inner bay can-*

*not be doubted.* Was it not also intended to exclude Mormon Island, which, according to the opinion of the court below on the original hearing, consisted, at high water, 'of a pile of rocks, covering not much more than an acre?' This question was answered in the negative by the supreme court of California, which on the rehearing of the case, said: 'The remaining question is, whether the land in controversy is included within the exception; and, as to this, we entertain no doubt that the exception properly construed embraces all the lands within the exterior boundaries of the inner bay of San Pedro, as shown on the map accompanying the patent and is not confined simply to such land as is covered by the navigable waters of that Bay. That this is the true meaning of the exception is made to appear not only from the fact that the inner bay of San Pedro is marked "excepted" upon the map referred to, but is also conclusively shown by the concluding portion of the survey itself, as returned and certified, in which, after giving the boundaries of the land surveyed by courses and distances, it designates the land surveyed, "exclusive of the lands above described as covered by the navigable waters of the inner bay of San Pedro," as being certain numbered lots on the plats of the public survey, neither of which lots includes any portion of the land within the exterior boundaries of the inner bay of San Pedro, as marked on said map.' We entirely concur in that view." (Page 739.) "If the claimants under the decree of confirmation did not themselves present the survey to the General Land Office, and ask a patent in accordance therewith, they accepted a patent based upon that survey, and plainly showing that it conformed to a survey that did not embrace, for the purposes of a patent, *anything within the exterior lines of the inner bay of San Pedro.*" (Italics ours.) The patent as thus interpreted excluded not only all lands within the inner bay covered by navigable water, but all lands within the exterior boundaries of said bay. If we follow this interpretation in the present case it necessitates the affirmance of the judgment, for it is not disputed that all the lands claimed by the plaintiff lie below the navigable waters of the inner bay.

A course of the inner bay exception survey was involved in the case of *Wheatley* v. *San Pedro etc. Ry.,* 169 Cal. 505, [147

Pac. 135]. It was there held that the shore line was the
boundary (see map, p. 508), but as to all calls to station
I.B.12, including the foregoing, the defendant concedes that
the shore line is the real boundary, but contends that the
last three lines are not meander lines; that all the land out-
side of these lines is owned by the defendant as successor
to the patentee, regardless of the fact that some of it lies
below the line of the mean high tide; for the reason that
by a patent issued in pursuance of a Mexican grant the
tide-lands therein pass to the grantee. This contention in-
volves a consideration of the actual shore line as shown by
later surveys, and is largely based upon the fact that such
survey shows so wide a departure from the courses and
distances of the inner bay exception as to demonstrate that
such lines were intended as arbitrary boundaries rather than
meander lines of the shore. A further statement of facts
will be necessary to present and discuss the defendant's
position. Parcels "C" and "B" lie east of the line con-
necting I.B.12 and I.B.13 (the line marked 12 on the plat)
and contain respectively 3.42 acres and 30.29 acres. Parcel
"A" lies to the south of line 13 (1.B.13 to I.B.14), and
contains 229.73 acres. The plane of mean high tide is 5.1
feet above the plane of mean low tide. Maps of the inner
bay were made in 1857, 1858, 1883, 1899, 1908. During
each of these surveys parcels "A," "B" and "C" were in
their natural condition. A comparison of the different
topographical surveys shows that there had been little
change in the bay during all this period.

From I.B.13 to I.B.14 the course is from six inches to one
foot below the level of ordinary high tide.

Nearly the entire East Basin lying east of Mormon Is-
land, including Parcel "A," lies under water from six
inches to a foot at ordinary high tide. Parcel "C," a
shallow bight, is covered by water, in the main from one
foot to one and one-half deep. At high tide the water is
deeper over parcel "B" than over parcel "C."

Southerly from station I.B.12 the survey followed for
several hundred feet practically along the 5.1 foot contour
line, until the first slough called for between those points
is approached. After crossing, the line again practically
follows the line of ordinary high tide for some distance
when it leaves the line of high tide, and crosses the south-

east portion of the bay, to I.B.13. This station is 1.1 feet below high-tide line. From I.B.13 to I.B.14 the line leaves the high-tide line and crosses ground covered at mean high tide by water from six inches to a foot or more in depth at ordinary high tide. Station I.B.14 is about 4.5 feet below ordinary high tide. From I.B.14 to I.B.15 the line for about 3,000 feet runs through still deeper water, between 1 to 3½ feet below mean high tide. Parcel "A" is nearly two miles in length along the line I.B.13 to I.B.15, and nearly 2,000 feet in width. It is a shallow portion of the bay itself. Around "C" and "B" there is a comparatively abrupt rise of 1.1 feet.

Parcels "O" and "P" are clearly parts of the bay and of San Pedro channel. The survey, upon leaving station I.B.12 at nine chains, crosses a slough four chains wide, course northeast, and at fifty-nine chains crosses à slough three chains wide, course east. It is clear that the surveyor did not intend to follow the high-tide line of these sloughs, which extended for long distances beyond the lines of the inner bay survey. From these facts the defendant deduces the conclusion that at I.B.12 it was the intent to make an arbitrary boundary line rather than to follow the meanderings of the shore line at high tide. In considering the survey, however, it should be borne in mind that the surrounding land to the east and south was so nearly level that a rise of a foot in the tide would, in some places, advance the shore line a mile, and in other places the land was even more nearly level. In legal contemplation, the bay may always be said to extend to the mean high-tide level; as a matter of fact the actual water line is constantly changing, and perhaps the mean high-tide level, as now so definitely and accurately determined, may have been unknown in 1858 when the survey for the patent was made.

The following statement by the supreme court of the United States in *Mitchell* v. *Smale,* 140 U. S. 406, [35 L. Ed. 442, 11 Sup. Ct. Rep. 819, see, also, Rose's U. S. Notes], is particularly applicable to the lines under consideration: "The difficulty of following the edge or margin of such projections, and all the various sinuosities of the water line, is the very occasion and cause of running the meander line, which, by its exclusions and inclusions of such irregularities of contour, produces an average result closely

approximating to the truth as to the quantity of upland contained in the fractional lots bordering on the lake or stream." In this survey, for the purpose of defining the patent boundary of the Mexican grant, the surveyor is not concerned with the question as to the amount of land contained within the patent boundaries as the basis of fixing the contract price. The amount of land granted, however, was eight and one-half leagues and this was an important element in fixing the boundaries thereof. The appellant contends that the area of the inner bay exception, conforming as it does to the traverse lines shown upon the plat and in the patent, tends strongly to confirm its position that the traverse lines of the inner bay exception were intended to be the boundary lines and not meander lines. This coincidence, however, was to be expected as the government rules of survey provide for such method of computation and, therefore, the statement of the area of 1,100.19 acres for the inner bay exception, adds nothing to the delineation of the boundaries, shown by the patent.

It is suggested that as the decree confirming the Rancho San Pedro made no exception of the inner bay, the unauthorized exception thereof ought not to be further extended by construction. This suggestion is not in accord with the decision of *De Guyer* v. *Banning, supra,* which holds that the patent boundaries are conclusive upon both the patentee and the United States. It is perhaps worthy of note that the decree confirming title in the patentee, and subsequently made the basis for the issuance of the patent, stated that the land thus confirmed to the petitioners contained eight and a half leagues more or less. As a league contains 4,340.278 acres (*United States* v. *Perot,* 98 U. S. 428, 431, 432, [25 L. Ed. 251]), the decree called for 36,892.363 acres. The patent recites that the claimant petitioned for confirmation of a ranch containing "ten leagues more or less," (43,402.78 acres), and had confirmed to them "eight leagues and a half more or less." The actual area conveyed to them, exclusive of the inner bay exception, is stated in the patent to be 43,119.13 acres, or only 283.65 acres less than the ten leagues claimed and 6510.42 acres more than confirmed to the patentees (8½ leagues). We do not, however, attach any importance to this point.

The case of *Producers Oil Co.* v. *Hanzen*, 238 U. S. 325, [59 L. Ed. 1330, 35 Sup. Ct. Rep. 755], is very much relied upon by the appellant because it is there held that the line run by the government surveyor, although purporting to be a meander line of a bayou, actually excluded from the survey portion of the high land between the meander lines and the bayou. There the cases stating the rule applicable are thus summed up: "They unquestionably support the familiar rule relied on by counsel for the Oil Company that in general meanders are not to be treated as boundaries and when the United States conveys a tract of land by patent referring to an official plat which shows the same bordering on a navigable river the purchaser takes title up to the water line. But they no less certainly establish the principle that facts and circumstances may be examined and if they affirmatively disclose an intention to limit the grant to actual traverse lines these must be treated as definite boundaries. It does not necessarily follow from the presence of meanders that a fractional section borders a body of water and that a patent thereto confers riparian rights."

The facts upon which the court distinguishes *Producers Oil Co.* v. *Hanzen, supra,* from those cases holding that the shore line and not the meander lines in a patent constitute the boundary lines of the land patented, are thus stated in the opinion: "In the instant case we find a survey" [by Bristol] "of improved lands made at the express request of the occupant to whom they were subsequently patented; a grant from the United States specifying the exact number of acres conveyed; a positive declaration in field notes that land to the north" [i. e., between the traverse line and the bayou] "lies outside the traverse lines; admission that excluded area contains not less than 40 acres of high ground, and evidence of large timber growing there; official plat delineating the surveyor's courses and specifying acreage of the several subdivisions, which cannot be said to indicate a water boundary beyond possible question. Outside the southern traverses of this plat, in space designated 'Open Lake,' lie 300 acres of fast land surveyed by Barbour in 1896. Although Noel, the Oil Company's immediate vendor, as owner, was in possession of property known as Wilson's Point place for some thirty years, and until .after alleged unlawful entry by defendants in error, his corporeal posses-

sion (as expressly stipulated) was limited east and north by the Bristol traverse lines and he never occupied or exercised any act of corporeal possession over the above indicated forty acres or more without the same." In that case, a successor of the United States government claiming under a mineral location, was contesting the validity and extent of the patent, and the above rules of construction required that the description in the patent should be most strongly construed against the patentee and in favor of the government and its successors. In the case at bar that same rule works against the contention of the appellant, for here the city succeeding to the rights of the government is seeking to establish its claim to land lying between the meander lines and the shore line. There the patentee was trying to maintain title to the land between the meander line and the shore line.

In considering the relation of the actual shore line to the meander line of the inner bay exception, much stress is laid, in appellant's brief, upon the intention of the surveyor. We are, however, not concerned with the intention of the surveyor who made the survey on the ground. The plat of his survey, with the field-notes were submitted to the United States Land Office at Washington by the United States surveyor-general at San Francisco, with the following certificate of approval: "The field notes of the 'Rancho San Pedro' and from which this map has been made out have been examined and approved and are on file in this office. United States Surveyor General's Office, San Francisco, California. February 19, 1858. J. W. Mandeville, United States Surveyor General for California"; and such plat thereafter filed in the General Land Office at Washington, D. C., and made a part of the patent. When we have determined that the patent and plat attached thereto on their face *purport* to meander the line of high tides of the inner bay exception, it follows that the grant should be so construed, in favor of the government, notwithstanding the fact that the surveyor, in making a survey on the ground, may have included within the exterior boundaries of the Rancho San Pedro tide-lands which should have been more carefully delimited by the meander lines of the inner bay exception, and thus excepted from the grant. In other words, if the patent and plat on their face show an intention to meander

the shore line of the inner bay, the latter is the proper boundary, where the effect of following the meander lines as boundary lines would be to convey tide-lands from the government to the patentee. [5] All the foregoing considerations compel the conclusion that the mean high-tide line of San Pedro Bay is the boundary between the land conveyed and the land retained by the government, and that therefore the claim of the plaintiff to the tide-lands as successors of the government is valid.

In anticipation of this possible construction of the patent, appellant contends that in any event parcels "C" and "B" should be excluded from the inner bay exception, because included in the mouths of estuaries tributary to the bay and that the surveyor crossed the same as required by law and by good surveying practice. The following statements in *Knight* v. *United States Land Assn.*, 142 U. S. 161, 207, 208, [35 L. Ed. 974, 12 Sup. Ct. Rep. 258, see, also, Rose's U. S. Notes], are relied upon, to wit: "Where a water of a larger dimension is intersected by a water of a smaller dimension, the line of measurement of the first crosses the latter at the points of junction, from headland to headland. The existence of tide-lands in the intersecting water in no respect affects the result. . . .

" 'In determining a boundary line stated as the line of "ordinary high water mark," on the bay of San Francisco, there can be no other course than to follow the stated line of ordinary high tide on the shore of the bay, crossing the mouths of all inferior tidal streams or estuaries, many of which enter into San Francisco bay at different points, and not to follow the meanders of any such inferior tidal streams or estuaries.' "   See, also, *Bolsa Land Co.* v. *Burdick et al.*, 151 Cal. 254, 260, [12 L. R. A. (N. S.) 275, 90 Pac. 532].

It is true that the course I.B.12 crosses two sloughs, one extending east and the other northeast. But in determining the proper point of crossing, if we follow the shore line to such slough or estuary, the point of crossing is the intersection of such shore line and such estuary to a corresponding point on the opposite bank. For this purpose we assume the bay to be filled with water to the mean high-tide line. The application of this principle to the lines of the bay at high tide is not free from difficulty. The banks of the northernmost channel are clearly defined and the line of inter-

section with shore of the bay clearly indicated. By crossing the channel diagonally from point to point parcel "C" is included in the bay.

Parcel "B" contains a total area of 47.41 acres but within the exterior boundaries thereof are four parcels of land indicated on the diagram as parcels "I," "J," "K" and "L," containing 41.31, .97, .86 and .98 acres respectively. Parcel "I" is separated from the balance of the Rancho San Pedro and from the other parcels by channels and mud flats which form a "horseshoe." The channel to the north of parcel "I" at low tide dwindles to a few feet and at high tide is five or six hundred feet wide along the line I.B.; thence narrows to two or three hundred feet wide and expands to five or six hundred feet. The channel to the south of parcel "I" is somewhat deeper and more uniform in width. Perplexing as it appears to locate the high-tide line of the bay as distinguished from the high-tide line of the estuaries flowing into the bay, we think the presumption in favor of the government and against the patentee sufficiently supports the finding of the trial court with reference to the high-tide line of the bay, and therefore as to the ownership of parcel "B."

In view of the interpretation of the patent adopted by the trial court and hereby affirmed, the various assignments of error in the admission of testimony become immaterial and need not be specially noted, such as the testimony of witness D. E. Hughes to the effect that in his opinion the lines I.B.13, I.B.14 and I.B.15 were ascertained by triangulation and not actually surveyed upon the ground.

Judgments affirmed.

Shaw, J., Lennon, J., Kerrigan, J., *pro tem.,* Lawlor, J., and Angellotti, C. J., concurred.

OLNEY, J., Concurring.—I concur in the major portion of the main opinion, but dissent from that portion which upholds the judgment of the lower court in its finding that title to all of parcel "B" is in the city. In my opinion, it very clearly appears from the evidence, from the original patent map, and from maps introduced by the city itself, that the high-tide line of the waters of the bay is intersected by inferior tidal streams or sloughs, and that the

boundary line of parcel "B," as found by the court, runs up these sloughs instead of crossing them as it should have done under the rule of *Knight* v. *United States Land Assn.,* 142 U. S. 161, [35 L. Ed. 974, 12 Sup. Ct. Rep. 258], and *Bolsa Land Co.* v. *Burdick,* 151 Cal. 254, [12 L. R. A. (N. S.) 275, 90 Pac. 532].

Rehearing denied.

All the Justices, except Olney, J., concurred.