Filed 10/14/22 P. v. Pitchford CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C095231 |
| Plaintiff and Respondent, | (Super. Ct. No. NCR58857) |
| v. | |
| WAYLON DOUGLAS PITCHFORD, | |
| Defendant and Appellant. | |

Nearly 20 years ago, defendant Waylon Douglas Pitchford was convicted of second degree murder after defendant's accomplice drove his car into a man at defendant's direction. The prosecution's theory of murder was based on the natural and probable consequences doctrine. Under that doctrine, a person is guilty not only of the offense he or she directly aided and abetted, but also of any other offense that was a natural and probable consequence of the crime aided and abetted. Effective January 1, 2019, however, Senate Bill No. 1437 (2017-2018 Reg. Sess.) barred further convictions for second degree murder under this doctrine (Stats 2018, ch. 1015, §§ 1-3). It also, with

Penal Code[1] section 1172.6 (former § 1170.95),[2] established a procedure for convicted murderers who could not now be convicted under the law as amended to retroactively seek relief.

In this appeal, defendant challenges the trial court's denial of his petition to vacate his murder conviction under section 1172.6. The trial court found defendant ineligible for relief because it concluded the record showed he remained liable for second degree murder under a theory other than the natural and probable consequences doctrine—namely, the theory of aiding and abetting a murder with implied malice. It reasoned that defendant had implied malice because, among other things, defendant told his accomplice to drive his car into the victim, attempted to dislodge the victim's grip when the victim grabbed on to the car's hood, pulled the emergency brake in an effort to eject the victim, and told his accomplice to hit the brakes, which, after his accomplice complied, resulted in the victim suffering a fatal injury.

Challenging the trial court's finding, defendant offers three arguments. First, he contends the trial court might have failed to review the trial transcript and might have relied on inappropriate sources for factual background. Second, he asserts aiding and abetting a murder with implied malice is not a valid theory of second degree murder. Third, after asking us to apply an independent standard of review, he contends the evidence in the record does not support the trial court's finding that he aided and abetted the murder. Finding no merit to these arguments, we affirm.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to section 1172.6 throughout this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

*Murder Conviction*

Defendant was charged with the murder of Anthony Sforzini in 2002. Several months before the charges, defendant saw Sforzini at an intersection. Defendant, Thomas McDonald, and Jennifer Tirri were in McDonald's car, with McDonald driving; and Sforzini, his fiancée, and Justin Burchiel were in another car. Both defendant and McDonald called Sforzini a "rat" on seeing him, apparently because Sforzini had previously informed police that McDonald sold drugs, and defendant further challenged him to a fight.

Tirri later described the events that followed at trial. After Sforzini got out of his fiancée's car, defendant told McDonald, "Hit him with the car, hit him with the car." McDonald did as instructed. He accelerated toward Sforzini, and Sforzini, after attempting to jump out of the way, landed on the car's hood. McDonald then drove away with Sforzini on the hood attempting to hold on. As McDonald drove, defendant hit one of Sforzini's hands to try to dislodge him and told McDonald to "slam on the brakes." Defendant then pulled the emergency brake (which Tirri called the "E-brake"), the car stopped, and Sforzini flew off the car and hit his head on the ground. Tirri did not know whether McDonald also applied the service brake. Afterward, defendant laughed and said, "Did you hear his head hit?"

Cecilio Marquez, who later spoke to defendant, testified that defendant described the events similarly. According to Marquez, defendant said, "We just took care of [Sforzini]." Defendant explained that he told McDonald to hit Sforzini with his car and then, while Sforzini was on the car's hood, he "pulled the E-brake, and [Sforzini] went off the hood of the car and bounced on the concrete a few times." He added that Sforzini "might be dead" and his brains were all over the road. Sforzini, as defendant anticipated, later died from head trauma.

3

Although both Tirri and Marquez testified that defendant pulled the emergency brake, two other witnesses questioned whether the emergency brake had in fact stopped McDonald's car. One eyewitness, who worked in an automotive shop, said he "would think" the rear of a car would dip if stopped with the emergency brake and the front of the car would dip if stopped with the service brake (or "the normal brakes"). He then said that, in this case, it appeared the front of the car dipped when the car stopped. But he added that not all emergency brakes cause the rear of the car to dip.

A defense expert testified consistent with the automotive shop worker. He said the sole use of the emergency brake to stop McDonald's car would generally cause the car to spin out if the tires started skidding, depending on road conditions and the driver's experience; and in this case, no one alleged that McDonald's car spun out. He added that scuff marks on the front tires, but not the back tires, indicated that McDonald's car recently skidded after application of the service brake rather than the emergency brake. He explained that use of the emergency brake for McDonald's car would affect the back wheels only, while use of the service brake would cause "the front wheels [to] skid first for stability reasons." He noted, however, that the scuff marks could also be consistent with the car being stopped through the simultaneous use of both the service brake and the emergency brake—at least so long as the emergency brake was not pulled up hard enough to lock the back tires.

After a trial to the court, the court found defendant guilty of second degree murder. It reasoned that defendant aided and abetted McDonald in hitting Sforzini and Sforzini's death was a natural and probable consequence of this crime. The court added that defendant "probably did" try to assist with the emergency brake, but it found "it was the service brake that stopped the car, not the emergency brake."

## II

### *Resentencing Petition*

Nearly 20 years after being sentenced, defendant petitioned the trial court to have his murder conviction vacated under section 1172.6.

Section 1172.6 was part of a bill, Senate Bill No. 1437, that " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) The bill made two changes relevant here. First, to amend the natural and probable consequences doctrine, it added a provision to section 188, which states: "Except [for felony murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); see *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*), superseded by statute on other grounds as stated in *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 591 (*Glukhoy*), review granted July 27, 2022, S274792.) Second, the bill added section 1172.6 to "provide[] a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, at p. 959.)

Under the procedure established in section 1172.6, if a petitioner makes a prima facie showing for entitlement to relief, the trial court must issue an order to show cause and then hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subds. (c) & (d)(1).) The statute adds that, at the hearing stage, "the burden of proof shall be on the

5

prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

After defendant filed his petition for resentencing under this statute, the trial court issued an order to show cause. The court held the hearing and then denied defendant's petition. It reasoned that the prosecution proved beyond a reasonable doubt that defendant was guilty of second degree murder under a theory independent of the natural and probable consequences theory—namely, aiding and abetting implied malice murder. The court stated that defendant had implied malice because he told McDonald to hit the victim; "attempted to dislodge the victim's grip" when the victim grabbed on to the car's hood; "told McDonald to hit the brakes," which McDonald did; pulled the emergency brake; "laughed as they drove away"; and bragged to others that they had "taken care of" Sforzini and left his brains on the road. The court added that "there is direct evidence of express[] malice" and that it thought defendant "shared McDonald's intent to kill the victim."

Defendant timely appealed.

DISCUSSION

I

*Defendant Has Not Shown The Trial Court Relied*

*On Inappropriate Sources Of Information*

Defendant first contends the trial court might have failed to review the trial transcript and might have relied on inappropriate sources for factual background, including the attorneys' arguments at sentencing, the probation report, and our 2004 opinion following his initial appeal. We are unpersuaded.

We agree, as defendant asserts, that a trial court cannot deny a defendant's section 1172.6 petition based on an attorney's argument, the factual history recited in a probation report, or the factual history recited in a prior appellate opinion. That follows from

6

section 1172.6, subdivision (d)(3), which explains that a trial court can consider only certain sources of material in denying a petition. It can consider evidence admitted at the section 1172.6 hearing, "evidence previously admitted at any prior hearing or trial that is admissible under current law," and "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) This limitation bars a trial court from relying on an attorney's argument at trial, which is not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 7 ["unsworn statements of counsel are not evidence"].) It also bars a trial court from relying on the factual history recited in a probation report or in a prior appellate opinion. (See *Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514 [under a canon of statutory construction, "the explicit mention of some things in a text may imply other matters not similarly addressed are excluded"].)

Although we agree with defendant on these points, we are not persuaded that the trial court relied on any improper source of factual information. Nor are we persuaded that the trial court failed to review the trial transcript. Defendant argues we should find in his favor because the prosecutor supplied copies of the sentencing transcript, the probation report, and our 2004 opinion and because the trial court "did not refer to the transcripts in its ruling and did not say it had read the record." He adds: "This court cannot assume the court below in fact read the transcripts." But as case law and statutory law make plain, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361; see Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].) Defendant has not overcome this presumption, particularly considering the trial court's explicit statement before the section 1172.6 hearing that it would "review the trial transcripts in the complete file."

Although defendant counters the Court of Appeal's decision in *People v. Flores* (2022) 76 Cal.App.5th 974 favors a different result, we disagree. The court there considered a trial court's determination that a petitioner failed to make a prima facie case

7

for resentencing. (*Id.* at p. 986.) At one point, the Court of Appeal commented: "Although the [trial] court stated it had reviewed the court's file regarding the case, it does not appear the court relied on the file in resolving the petition." (*Ibid.*) Citing this quote without any context, defendant claims a reviewing "court cannot assume the court below in fact read the transcripts." But that is not the appropriate takeaway from *Flores*. The court did not mean, as defendant suggests, that it disbelieved the trial court's claim that "it had reviewed the court's file regarding the case"; it instead meant that even though the trial court said it reviewed the file, it based its decision on something other than the file—namely, "the court denied the petition on the ground petitioner failed to make an unspecified showing beyond the factual allegations contained in the petition." (*Id.* at p. 987.) Considering defendant's offered quote in context, we reject his reading of *Flores*.

II

*Defendant Has Not Shown The Trial Court Relied On A Flawed Theory Of Murder*

Defendant next contends the trial court relied on a flawed theory of second degree murder—aiding and abetting a murder with implied malice. In his view, to be liable for murder under an aiding and abetting theory, a defendant must specifically intend the result of murder; but because implied malice murder is "an unintended result crime," "one cannot aid and abet an implied malice murder." (Capitalization omitted.) We reject his argument.

Our Supreme Court covered this topic in *Gentile*, *supra*, 10 Cal.5th 830. It explained that before Senate Bill No. 1437, California law recognized "two forms of liability for aiders and abettors." (*Gentile*, at p. 843.) "First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Ibid.*) "Second, under the natural and probable consequences doctrine, an

8

accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*Ibid.*)

The *Gentile* court found Senate Bill No. 1437 did away with the second form of liability for aiders and abettors when it added section 188, subdivision (a)(3). (*Gentile*, *supra*, 10 Cal.5th at pp. 846-847.) Before Senate Bill No. 1437 was enacted, and still today, sections 187 and 188 have together provided that a person cannot be convicted of murder unless he or she possessed either express or implied malice. Section 188 adds that "[m]alice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature" and "implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(1)-(2).) Section 188 now further states: "Except [for felony murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); see *Gentile*, at pp. 842-843.) Considering this added language, the *Gentile* court found the natural and probable consequences doctrine is no longer compatible with section 188 "because an aider and abettor need not personally possess malice, express or implied, to be convicted of second degree murder under a natural and probable consequences theory." (*Gentile*, at p. 847.)

In reaching this conclusion, the court rejected an amicus curiae's proposed "hybrid doctrine" that would have kept the natural and probable consequences doctrine for second degree murder but limited its application to cases where the defendant possessed malice. (*Gentile*, *supra*, 10 Cal.5th at p. 849.) The amicus curiae contended adopting this hybrid doctrine was necessary to prevent some defendants from getting away with murder, offering two examples to prove its point. "In one case, the driver in a driveby shooting

9

was convicted of second degree murder after he 'observed rival gang members on [his gang's] "turf" ' and 'drove up to the rivals at a rapid speed to scare them' as well as 'beat them up and harm them,' at which point his companion suddenly opened fire and caused the death of one of the rival gang members. [Citation.] In the other case, three gang members were convicted of second degree murder for ambushing and stabbing to death a person walking home, but the evidence was inconclusive as to which of the defendants actually caused the death of the victim. [Citation.] Without a 'hybrid doctrine,' the [amicus curiae] contend[ed], these defendants would have 'literally g[otten] away with murder.' " (*Id.* at pp. 849-850.)

But our Supreme Court rejected this concern, explaining that "second degree murder in both cases might have been pursued under a direct aiding and abetting theory"—even though, at least in the first case, the defendant did not intend anyone's death. (*Gentile*, *supra*, 10 Cal.5th at p. 850.) The court explained: "Such a theory requires that 'the aider and abettor . . . know and share the murderous intent of the actual perpetrator.' [Citation.] For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' [Citation.] Therefore, notwithstanding Senate Bill [No.] 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Ibid.*)

Following *Gentile*, we find an aider and abettor who lacked express malice—that is, who lacked a "manifested . . . deliberate intention to unlawfully take away the life of a fellow creature" (§ 188, subd. (a)(2))—can still be convicted of second degree murder if the person at least had implied malice (§ 188, subd. (a)(1)). Several courts, including our own, have already reached this very conclusion following *Gentile*. (See, e.g., *People v. Powell* (2021) 63 Cal.App.5th 689, 714 ["reject[ing] . . . contention that direct aiding and

10

abetting implied malice murder is an invalid legal theory"]; see also *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499 [same].)

Defendant contends we should nonetheless ignore *Gentile* because its discussion "was dicta." (See *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158 ["Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case"].) Even assuming *Gentile*'s discussion was dicta, "our high court's ' "dicta generally should be followed, particularly where the comments reflect the court's considered reasoning." ' " (*Glukhoy*, *supra*, 77 Cal.App.5th at p. 589.) Our Supreme Court has said the very same about its dicta. (*Los Angeles v. San Pedro etc. R. R. Co.* (1920) 182 Cal. 652, 660 ["The statements in the opinions of the supreme court of this state and of the United States relating to the 'inner bay exception,' although *obiter dicta*, are very persuasive as to the meaning of the patent"].)

Defendant maintains we should still reject *Gentile*'s discussion because it is inconsistent with traditional notions of aiding and abetting liability. Citing *People v. Koenig* (2020) 58 Cal.App.5th 771 at pages 799 and 800, he reasons that "[t]o be liable as an aider and abettor, one must specifically intend to aid the perpetrator [to] commit the underlying crime"—which in this case, was murder. But defendant omits that the *Koenig* court said this was only "[g]*enerally*" true. (*Id.* at p. 800, italics added.) Nor does he acknowledge that the viability of aiding and abetting implied malice murder was not at issue in *Koenig*. (See *People v. Brown* (2012) 54 Cal.4th 314, 330 ["cases are not authority for propositions not considered"].) The *Koenig* author, moreover, subsequently authored other decisions specifically "reject[ing] [the] contention that direct aiding and abetting implied malice murder is an invalid legal theory." (*People v. Powell*, *supra*, 63 Cal.App.5th at p. 714; see *Glukhoy*, *supra*, 77 Cal.App.5th at p. 591.) Given this context, we find defendant's reliance on *Koenig* misplaced.

Defendant also argues *Gentile*'s discussion is inconsistent with *People v. Swain* (1996) 12 Cal.4th 593. Our Supreme Court there held that an intent to kill, and not

merely implied malice, is a required element for the crime of conspiracy to commit murder. (*Id.* at pp. 596, 602-603.) It reasoned that it "would be illogical to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is implied," because a conspiracy to commit murder is a crime *before* any murder but implied malice is only determined *after* the murder "in part through hindsight." (*Id.* at p. 603, italics omitted.) Defendant argues the same logic applies here, but unlike the crime of conspiracy to commit murder, aiding and abetting a murder is not an inchoate crime that is complete before the murder occurs. No one, after all, could be found guilty of aiding and abetting a murder that has yet to occur. (See *Gentile*, *supra*, 10 Cal.5th at p. 843 ["Aiding and abetting is . . . a form of derivative liability for the underlying crime"].) For that reason, the "illogic[]" at the heart of the *Swain* court's reasoning has no application here.

Finding no persuasive ground for departing from *Gentile*'s alleged dicta, and consistent with other published decisions on this topic, we reject defendant's claim that aiding and abetting a murder with implied malice is an impermissible theory of second degree murder.

III

*Defendant Has Not Shown The Trial Court's Ruling Lacks Sufficient Evidentiary Support*

Lastly, after asking us to apply an independent standard of review, defendant contends the evidence produced at trial does not support the trial court's finding that he aided and abetted Sforzini's murder. We reject defendant's preferred standard of review and his challenge to the sufficiency of the evidence.

A

*Standard Of Review*

We start with the relevant standard of review for reviewing the trial court's findings. According to defendant, we should independently evaluate the evidence to determine whether defendant is ineligible for resentencing. He reasons that when a trial

12

court relies on a written record to make its findings, as opposed to live testimony, no ground exists for deferring to its findings. We disagree.

The principal issue raised here concerns a question of fact—namely, whether defendant, with implied malice, directly aided and abetted Sforzini's murder. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1222 [" ' "Whether someone is an accomplice is ordinarily a question of fact for the jury" ' "].) And when an appellate court is tasked with reviewing a question of fact, it evaluates only for substantial evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [a reviewing court "scrutinizes for substantial evidence the resolution of a pure question of fact" and "the resolution of a mixed question of law and fact that is predominantly factual"]; see *People v. Clements* (2022) 75 Cal.App.5th 276, 298 [appellate courts review a trial court's factfinding under § 1172.6 for substantial evidence].)

That is true even when, as in this case, the trial court's findings are based on a paper record rather than on live testimony. Our Supreme Court's decision in *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*) is instructive on this point. The court there considered whether a defendant was eligible for resentencing following an amendment to the "Three Strikes" law that both narrowed the class of third-strike felonies that triggered the law's sentencing enhancements and allowed inmates sentenced under the original Three Strikes law to seek resentencing consistent with the amended law. (*Perez*, at pp. 1061-1062.) Under that resentencing scheme, similar to the law here, "once an inmate has made an initial showing of eligibility for resentencing, the burden is on the prosecution to prove beyond a reasonable doubt that one of the grounds for ineligibility applies." (*Id.* at p. 1062; see § 1172.6, subd. (d)(3).) Also under that resentencing scheme, similar to the law here, when evaluating whether the prosecution has made this showing, the court may consider, among other things, evidence previously admitted at trial. (§ 1170.126, subd. (g) [broadly allowing courts to consider relevant evidence]; see

13

§ 1172.6, subd. (d)(3) [allowing courts to consider, among other things, "evidence previously admitted at any prior hearing or trial that is admissible under current law"].)

Attempting to meet its burden in *Perez*, the prosecution contended the defendant was statutorily ineligible for resentencing because the evidence produced at trial for his third-strike offense showed he had been armed with a deadly weapon—and under the Three Strikes law, even as amended, that fact triggers the law's sentencing enhancements. (*Perez*, *supra*, 4 Cal.5th at pp. 1061, 1065-1066; see § 1170.12, subd. (c)(2)(C)(iii).) But the trial court disagreed after considering the record from the defendant's earlier trial. (*Perez*, at pp. 1061, 1065-1066.) Although, on review, the Supreme Court acknowledged that the trial court's eligibility determination was based only on the record of conviction, it still found the trial court's finding should be reviewed only for substantial evidence. (*Id.* at p. 1066.) It reasoned that "the question whether a defendant was armed with a deadly weapon during his or her current offense remains a question of fact, and we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid.*)

We follow that approach here. Because the question whether someone is an accomplice is ordinarily a question of fact—and indeed, a question traditionally submitted to a jury (*People v. Rangel*, *supra*, 62 Cal.4th at p. 1222)—we similarly see no reason to withhold the deference generally afforded to such findings (see *People v. Waidla, supra*, 22 Cal.4th at p. 730 [factual findings are reviewed for substantial evidence]). Our decision in this respect accords with other Courts of Appeal that have considered the appropriate standard of review for a trial court's factfinding under section 1172.6. (See, e.g., *People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090 [courts review trial court's finding for substantial evidence]; *People v. Clements*, *supra*, 75 Cal.App.5th at p. 298 [same]; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747 ["We review the trial court's determination at the section [1172.6], subdivision (d)(3) hearing for substantial evidence"].)

Defendant suggests we should follow *People v. Vivar* (2021) 11 Cal.5th 510, not *Perez,* and subject the trial court's decision to de novo review. We find *Vivar* readily distinguishable. That case involved an issue—whether "a prejudicial error . . . affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea"—that our Supreme Court found "analogous" to its past immigration cases raising "predominantly questions of law." (*Id.* at pp. 517, 524, italics omitted.) After considering this detail, along with "multiple factors with special relevance [t]here," the court "embrace[d] . . . independent review in th[at] context." (*Id.* at p. 527.) Unlike the court in *Vivar*, we are tasked with resolving a factual question. Consistent with *Perez* and the rule that questions of fact are reviewed for substantial evidence, we will review the trial court's findings for substantial evidence.

B

*Application Of The Substantial Evidence Standard*

Having established the appropriate standard of review, we now consider defendant's claim that insufficient evidence supports the trial court's finding that he aided and abetted Sforzini's murder.

Defendant's argument focuses on the testimonies of Tirri and Marquez. As covered in our background discussion, Tirri testified that she heard defendant instruct McDonald to drive his car into Sforzini, saw defendant attempt to dislodge Sforzini from the car's hood after he gripped the car's doorposts, heard defendant tell McDonald to "slam on the brakes," and saw defendant pull the emergency brake. Consistent with Tirri, Marquez testified that defendant acknowledged much of these events. Defendant said he told McDonald to hit Sforzini with his car and then, while Sforzini was on the car's hood, defendant said he "pulled the E-brake, and [Sforzini] went off the hood of the car and bounced on the concrete a few times."

According to defendant, however, neither witness should have been found credible because Tirri had ulterior motives (she wanted to, in her own words, "save [McDonald's]

15

ass"), both used "the not-so-usual term 'e-brake' for the emergency brake," and both offered testimony that did not square with the testimony of two others. Defendant adds that McDonald had a stronger motive for killing Sforzini because, among other things, Sforzini sent the police to McDonald's house, not his house. For those reasons, defendant argues "[n]either Tirri's nor Marquez'[s] testimony reasonably inspires confidence or is of solid value." The crux of defendant's argument, then, is not that Tirri's and Marquez's allegations, if believed, were insufficient to support his conviction; it is instead that their allegations should not have been believed.

But defendant's argument evinces a misunderstanding of the applicable standard of review—which again, is the substantial evidence standard, not defendant's preferred standard of independent review. To determine if sufficient evidence supports a trier of fact's finding, we must " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.) Our job is not to evaluate witness credibility, " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Ibid.*) Nor is it our job to reweigh the evidence. We instead must resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture. (*Ibid.*; see *People v. Davis* (2013) 57 Cal.4th 353, 360.)

Applying this deferential standard here, we reject defendant's challenge to the sufficiency of the evidence. Tirri might have had ulterior motives and had less credibility for that reason, as defendant suggests, but that was a matter for the trier of fact (in this case, the trial judge) to decide. Similarly, Tirri's and Marquez's use of an allegedly unusual term for the emergency brake might suggest coordination and thus undermine

16

their credibility. But again, we will not second-guess the trial judge's witness credibility determinations, " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Lee*, *supra*, 51 Cal.4th at p. 632.)

We also reject defendant's remaining argument concerning the alleged conflict between the different witnesses' testimonies. He asserts, for instance, that a fingerprint expert's findings were inconsistent with Tirri's testimony. On that topic, Tirri said Sforzini grabbed the doorposts when on the hood of McDonald's car. But the fingerprint expert found no fingerprints on the passenger side doorpost; he only found Sforzini's left index and middle fingerprints on the car's hood. Even so, although this perhaps tends to show Tirri misdescribed the placement of Sforzini's hands, that does not mean the trial judge wrongly credited her testimony. A witness, after all, can honestly make mistakes and still be found credible. As juries are often informed (albeit, not here, because there was no jury), " '[p]eople sometimes honestly . . . make mistakes about what they remember' " and the trier of fact is " 'responsible for judg[ing] the credibility or believability of the witnesses.' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 658.)

Defendant further asserts that, inconsistent with Tirri's and Marquez's testimonies, a car expert said the car would have spun out had the emergency brake been used and "[i]ndependent witnesses said the car did not fishtail when it stopped and the rear of the car did not dip as it would if the emergency brake had been deployed." But although defendant's characterization of the record is largely accurate, he omits important details about these witnesses' testimonies. First, generally consistent with defendant's claim, one eyewitness (though not multiple "[i]ndependent witnesses") testified that McDonald's car did not fishtail when it stopped and that he "would think" the rear of a car would dip if stopped with the emergency brake. He added that, in this case, the front of the car appeared to dip when it stopped, indicating that the car had stopped with the

service brake. But the witness added a significant caveat—not all emergency brakes cause the rear of the car to dip.

Second, again generally consistent with defendant's claim, an expert witness said the sole use of the emergency brake to stop McDonald's car would generally cause the car to spin out if the tires started skidding, depending on road conditions and the driver's experience. But the record here was unclear whether McDonald's car skidded. The eyewitness who discussed the potential dipping of the car, for instance, said "the car came to an abrupt stop" and he heard no screeching or similar noise. That suggests the car never skidded and so, considering the expert's testimony, the car had no reason to spin out even if the emergency brake had been applied. And although Tirri suggested that McDonald's car did in fact skid, the expert explained that well-trained drivers could keep a car straight even with the rear wheels skidding; and as far as we can find, nothing in the record details McDonald's driving ability.

These added details, which defendant never acknowledges, undermine his attack on Tirri's and Marquez's credibility. And even setting aside these details, the referenced eyewitness's and car expert's statements were still not necessarily inconsistent with Tirri's and Marquez's testimonies. Neither Tirri nor Marquez, after all, claimed McDonald's car stopped exclusively through the use of the emergency brake. Although Tirri said she observed defendant pull the emergency brake, she said defendant instructed McDonald to "slam on the brakes" and acknowledged she did not know whether McDonald ultimately complied. A reasonable reading of the evidence, then, which is entirely consistent with Tirri's and Marquez's testimonies, is that McDonald applied the service brake and defendant pulled the emergency brake around the same time. That, indeed, was the trial court's conclusion both in defendant's initial trial and on defendant's petition for resentencing.

In the end, defendant has at best shown that the trial court could have declined to credit Tirri's and Marquez's testimonies, not that it needed to reject their testimonies.

18

Having rejected defendant's reasons for asserting that Tirri's and Marquez's testimonies neither "inspire[] confidence [n]or [are] of solid value," which is defendant's sole ground for his argument here, we reject his challenge to the sufficiency of the evidence.[3]

## DISPOSITION

The judgment is affirmed.

/s/_____,
Robie, Acting P. J.

We concur:

/s/_____,
Hull, J.

/s/_____,
Mauro, J.

---

[3] Defendant also contends the evidence is insufficient to support a finding of express malice. The trial court, again, premised its decision largely on its finding that defendant acted with implied malice. But it also indicated that defendant acted with express malice. It noted that "there is direct evidence of express[] malice" and that it thought defendant "shared McDonald's intent to kill the victim." But because we find the evidence sufficient to support the trial court's finding of implied malice, which is itself sufficient to support the trial court's ruling, we need not address defendant's challenge to the trial court's further finding of express malice.